STATE OF MISSOURI, EX REL. M. A. ROSENBLATT, Respondent, *v.* H. W. SARGENT ET AL., Appellants.

May 23, 1882.

1. A sale under a judgment in a proceeding to collect back taxes is a judicial sale.

2. The policy of the law is opposed to setting aside judicial sales of real estate.

3. The purchaser at a tax-sale need look only to the judgment, execution, levy, and sheriff's deed.

4. Inadequacy of consideration is not sufficient ground for setting aside such a sale, where the owner was a party to, and had legal notice of, the proceeding.

5. An execution which directs a sale of the real estate, or so much thereof as will satisfy the judgment, is in accordance with the statute.

6. A tax-sale made in accordance with the judgment and execution will not be set aside because the sheriff, in the absence of the defendants and without objection, sells lot after lot until all are sold, though the first three lots sold for enough to pay the taxes upon the entire tract.

7. At a tax-sale under a judgment against several lots against each of which its own taxes are a separate lien, the collector is not bound to direct the sheriff to stop the sale as soon as he has in his hands enough money to pay all the taxes due upon the series of lots.

APPEAL from the St. Louis Circuit Court, ADAMS, J.
*Affirmed.*

BROADHEAD, SLAYBACK & HAEUSSLER, for the appellants.

DONOVAN & CONROY, M. B. JONAS, and KING, CHAPIN & KING, for the respondent.

BAKEWELL, J., delivered the opinion of the court.

This was a motion to set aside a sale made under execution issued upon a judgment in the above entitled cause, for back taxes. The motion, on hearing, was overruled.

The petition in the original proceeding was filed on September 3, 1879. Eleven defendants were charged as owners, of whom two are married women, whose husbands are made defendants. The petition is in the form usual in such cases, and seems to be sufficient. The property is said to be in the city of St. Louis, and is further described as follows : —

" No. 1. Lots 4, 5, 6, 7, in city block of Risley Addition, fronting twenty feet on Second Street, by one hundred and eight and five-twelfths feet deep. No. 2, lot 8, in same block, fronting twenty and seven-twelfths feet on Second Street, by one hundred and eight and five-twelfths feet deep. No. 3, lots 9, 10, 11, 12, in same block, fronting nineteen feet on Risley Street, by a depth of eighty-five and three-twelfths feet. No. 4, lot 13, and the south part

of lot 14, in same block, fronting twenty-six and six-twelfths feet on Risley Street, by eighty-five and three-twelfths feet deep.''

The claim is for back taxes of 1877, and is set out as follows : '' In the aggregate, upon each of said lots or tracts described herein, as follows : Upon said real estate numbered 1, $302.40, — that is to say, $25 upon each of lots numbered 4, 5, and 6, and $226.80 upon lot numbered 6 ; and upon said real estate numbered 2, $26.04 ; and upon said real estate numbered 3, $49.28, — that is to say, $12.32 upon each of said lots ; and upon said real estate numbered 4, $17.08.''

Three of the defendants were personally served. One was served by copy ; and as to the remaining defendants who were not found, there was an order of publication, which was duly complied with. This order and advertisement described the property as it was described in the petition. All the defendants made default ; and, at the October term, 1880, there was judgment in favor of the plaintiff.

This form of the decree is as follows : The court finds that there is due upon the real estate (describing it as described in the petition) state, school, and city taxes for 1877 ; '' and that the amount of said taxes and interest is as follows, to wit: On each of said lots numbered 4 and 5, in paragraph numbered one herein, the sum of $33.75.'' There is, then, a separate finding as to taxes against each lot in each paragraph, and that defendants are the owners thereof; and then, *consideratum est*, etc., '' that the sum of $33.76 be levied out of each of said lots 4 and 5, as described in paragraph number one herein, being the amount of said back taxes, and interest thereon from January 1, 1878, at one per centum per month ; '' and so on, a separate judgment being rendered against each lot in each paragraph. The decree then declares the judgment a first lien in favor of the state upon said real estate, and orders that

the lien be enforced, and that said real estate, or so much thereof as may be necessary to satisfy said judgment, interest, and costs, be sold according to the law regulating the sale of real estate under execution, and "that the costs be so distributed against each of said lots in proportion as the same bear to the whole amount of costs charged in this suit, and that a special *fieri facias* issue hereon."

Execution was issued on February 10, 1881, in accordance with the judgment. The property was duly advertised for sale in accordance with the description in the petition, decree, and execution, and was sold on March 15, 1881, to Zachariah T. Yarnall. The property was sold in separate lots. Lot 4, for $170; lot 5, $175; lot 6, $660; lot 7, $220; lot 8, $90; lot 9, $175, lot 10, $115; lot 11, $110; lot 12, $105; lot 13, and south part of lot 14, $180, — making a total of $2,000. The total amount for which judgment had been rendered being $529.01.

This execution was returnable to the April term; and, on the fourth day of June of that term, the motion was filed to set aside the sale, by defendants Gazzam, Cochrane, and Phœbe Hunt, together with her husband, and Horner, her trustee, and by Muldoon and Sharpe, who were not defendants, but who claimed to be the parties in possession of the property.

The grounds alleged in the motion are, that judgment and execution are irregular, illegal, and void; that the sheriff sold more property than he advertised, and more than the special judgment authorized, and that he sold without legal notice; that no demand of payment was made before the levy; that the property was sacrificed for $2,000, whereas it was worth $40,000; and that the whole property constituted one common improvement, to wit, a packing and slaughter-house; and that defendants offer to pay to the purchaser his bid, and all interest and charges.

On the hearing of the motion no testimony was offered on the part of the purchaser. The only witness examined in

support of the motion was Mr. Haeussler, a member of the firm of attorneys whose name is signed to the motion. He testified that the property was worth, in cash, $15,000, at the date of the sale; that he himself would have given $10,000 for a quit-claim deed to it, as a speculation, and taken his chances as to the title; and that he would have given the total amount of the judgment for any one of the lots. On cross-examination, Mr. Haeussler said in substance as follows; we abbreviate to save space and time: The title to the property has been in litigation for many years. There were three suits and three claimants. I understand that these suits have been settled. I represent Muldoon and Sharpe, who have been in possession, packing pork on the property for six years, during two years of which time the property was in the hands of a receiver of the United States Circuit Court. Afterwards Muldoon and Sharpe paid rent to Gazzam and Cochrane, as they did before the receiver's time. Defendants Gazzam and Cochrane, Horner and the Hunts, are the landlords of Muldoon and Sharpe, and are represented in this application by their own counsel. I offered Yarnall $2,500 for the property for myself, Muldoon, and Sharpe, and declined to offer more. The title is badly mixed. It is such that a speculative Dutchman would not give more than $2,500 for, in its present condition. I am familiar with the title; believe I would have a good title if I had defendant's title. I would have been glad to get their title for $10,000. The back taxes on the property, besides those mentioned in the execution, amount to $2,500, for which suits are being brought.

An affidavit of Muldoon was offered, with an accompanying diagram. This affidavit is to the effect that the ten lots form a common improvement, used as a pork-packing house and hog run, the northern twelve feet being vacant; and that the improvements are two stories high, and worth $10,000. No one demanded the taxes of affiant or his firm. A lease from Mrs. Hunt's trustee to Muldoon and Sharpe

for one year from July, 1876, renewed for one year for the premises in question, was also put in evidence, and also a quit-claim deed from Mrs. Hunt, her husband, and her trustee, dated June, 1877, to Gazzam and Cochrane, of Pittsburg, Pennsylvania, for the premises in question. There was no other evidence except a plat of the land.

The sale was a judicial sale, and entitled to all the presumptions attaching to such sales. *Wellshear* v. *Kelly*, 69 Mo. 343. There was no request to subdivide. Nor does it appear that further subdivision was practicable. The neglect of the sheriff to sell the land by its smallest subdivisions would not invalidate the sale. It is unnecessary to encumber this opinion by repeating at length what has so recently been said by this court as to such sales. *Sheehan* v. *Stackhouse*, 10 Mo. App. 469; *Brown* v. *Walker*, 11 Mo. App. 226; *Howard* v. *Stevenson*, 11 Mo. App. 410. We may remark, however, in passing, that counsel for appellant has entirely misapprehended the case of *Brown* v. *Walker*. It is not held or said in that case, as counsel suggests in his brief, that on a judgment against two vacant lots, each of which is liable for only a part of the tax, both may be legally sold together: a single judgment against both the lots is, in that opinion, distinctly declared to be erroneous. It is held only, that the objection does not go to the jurisdiction, and that the fact cannot be shown in a proceeding in ejectment, by oral evidence, for the purpose of impeaching the judgment in the back-tax proceeding, and that the sheriff's deed is not invalidated by mere irregularities in the proceedings in the suit that led to the sale.

We notice the vehemence of language with which counsel for appellant, in his brief and in other briefs in cases arising upon tax-sales, expresses his strong dissent from the views expressed and the results arrived at in these cases by this court and by the supreme court; but we find nothing in what is said in these cases that seems to warrant the con-

viction that he expresses, that recent legislation, as interpreted by the courts, is leading to any " confiscation " of the property of the citizen. If by " confiscation " counsel means merely the taking of property into the public treasury, all collection of taxes may be called confiscation. But the word is not commonly used in that sense. Though the taking of property, because the thing taken is required for public use, may sometimes be called confiscation, the word cannot be properly applied to the taking of property by the government to provide for the general wants, the protection of the public, and the support of the institutions of society. It ought not to be applied to a legitimate exercise of the powers of taxation.

And there seems to be nothing in the peculiar circumstances of the present case which makes it a glaring instance of abuse of power on the part of the government which, surely, may adopt effectual means to collect its revenue.

The owners of the property sold, had proper notice. Some of them were personally served. No one of them seems to have thought it expedient to redeem the property whilst it might have been redeemed. None of them appear to have attended the sale. The present proceeding was instituted in the trial court only by Mrs. Hunt and her husband and trustee, and two of the non-resident defendants ; whilst the only parties moving to set aside the sale who are represented by counsel here are Muldoon and Sharpe, who are merely lessees of Mrs. Hunt. The price paid was probably inadequate ; but that is not alone sufficient ground for setting aside a judicial sale. There seems to be nothing in the contention that the description of the lots in the execution was such as would induce the belief that the sheriff would offer the lots in groups. They were grouped together evidently for facility of description alone.

The decree, which is followed in the advertisement and

execution, directs that the real estate shall be sold, or so much thereof as may be necessary to satisfy the judgment, and interest and costs.   But it is plain that this applies to each lot, and could not be misunderstood to mean that, when any lot or lots had brought the amount of the entire tax upon all the lots, the sale would be stopped.   The judgment is a separate judgment against each lot for its own burden of taxes, and this is what the law requires.

The property was assessed under the revenue law of 1872, which provides (Wag. Stats. 1167, sect. 49) that all lots in cities shall be arranged according to the number of the lot; that (sect. 54) each town lot shall be assessed separately in the manner (sect. 75) provided by the general provisions of the law.   The law of 1872 further provided, (Acts 1872, p. 124, sect. 203), — and the same provision was in force at the time of this sale, — that " each tract of land or lot shall be chargeable with its own taxes, no matter who is the owner nor in whose name it was assessed or advertised."

The statute further provides (Acts 1877, p. 386, sect. 7 ; Rev. Stats., sect. 6836), that, " the judgment, if against the defendant, shall describe the land upon which taxes are found to be due ; shall state the amount of taxes and interest found to be due upon each tract or lot, and the year, or years, for which the same are due, up to the rendition thereof, and shall decree that the lien of the state shall be enforced, and that the real estate, or so much thereof as may be necessary to satisfy such judgment, interest, and costs, be sold, and a special *fieri facias* shall be issued thereon, which shall be executed as in other cases of special judgment and execution, and said judgment shall be a first lien upon said land."   In other cases of special execution, the sheriff is directed " to divide the property, if susceptible of division, and to sell so much thereof as will be sufficient to satisfy the execution, unless the defendant in the

execution shall desire the whole of any tract or lot of land to be sold together.'' Rev. Stats., sect. 2368. The judgment in this case followed the law; the execution followed the judgment; the property was not susceptible of further subdivision, nor was the sheriff asked to sell otherwise than as he actually sold.

It is, however, earnestly contended that, inasmuch as the sale of the three lots first offered brought enough to pay all the back taxes found to be due upon all the ten lots, when the sheriff had this money in his hands, the sale should have been stopped.

We need not now inquire whether where several lots belonging to joint defendants are offered for sale under a judgment for taxes, if one or two lots bring the amount due upon the whole series, the sheriff is bound, at the request of any one of the defendants, or of all of them, to stop the sale. That is not the question presented by this record. The question that we are to consider is this: Whether, in a proceeding to sell property under a judgment for back taxes, naming the several defendants as joint owners, if no one represents any defendant at the sale, and no application is made to the sheriff or to the collector in the matter, the sheriff must stop the sale when any number of lots sold has brought the total amount chargeable against the series; and whether, if this is not done, this is such an irregularity as ought to avoid the sale, and deprive the purchaser of his bargain, and put the state to another sale to collect its taxes, on application made at the return term of the writ by one of the several defendants beneficially interested in the property? And we think that this question must be answered in the negative.

It is true that it is held that a sale by a collector is of no validity if the taxes were in fact paid; that a distress must not be excessive, and that a collector is liable in trespass if he sell upon his warrant a greater number of chattels

than is sufficient to pay the tax-bill and costs. *Scekins* v. *Goodale*, 61 Me. 450; *Care* v. *Forrest*, 126 Mass. 127; *Thompson* v. *Monnier*, 4 Fost. 238. But the case before us is one of the sale of real estate in which each lot was chargeable with its own taxes, and the sheriff pursued his writ; and, so far as the rights of the purchaser at the judicial sale are concerned, it is held that the " purchaser looks to the judgment, execution, levy, and sheriff's deed. If they are right, all other questions are between the parties to the judgment and the sheriff." It is against the policy of the law lightly to set aside judicial sales of real estate; and such a course tends to the injury of the debtor class, by depreciating their property when brought to the sheriff's hammer. It may be said that it was the duty of the collector to attend the sale, and, as soon as the sheriff had enough money in his hands by the sale of property which was sold as the property of the defendants, to look to the surplus after paying taxes on the lots sold, to pay the taxes which had been declared a lien upon the other lots. No one of the defendants, however, intimated any wish that this should be done; perhaps, some of them may have parted with their interest in the lots before the sale was made, and may have been unwilling that the surplus belonging to them after the sale of each lot should be applied in extinguishing a special lien upon real estate in which they no longer had any interest. Nor does the law allow the collector to seize personalty for taxes without notice to the party liable, given in person, or by leaving a copy with his family at his residence (Rev. Stats., sect. 6754), which in case of non-residents seems impossible. Nor is it clear that the statute contemplates a seizure of personalty for back taxes on realty which have been reduced to judgment and for which a special lien is given. Rev. Stats., sect. 6754. However this may be, we think the collector was under no obligation to stop the sale, which was proceeded with in strict accordance with the judgment, and that

nothing was shown on hearing of the motion which enables us to see that the circuit court erred in refusing to set the sale aside. The judgment will therefore be affirmed. Judge LEWIS concurs; Judge THOMPSON dissents.

THOMPSON, J., delivered a dissenting opinion.

I cannot agree with the opinion which has been delivered by my learned brethren in this case. It appears that when the sheriff had sold three of the lots he had secured sufficient money to pay the taxes, costs, and charges assessed against the owners in respect of all the lots. I think, then, that he had no power to proceed further with the sale without the consent of the tax-debtors. I think this for two reasons : 1. I do not think that the terms of the back-tax law, fairly construed, and taken in connection with the other provisions of the law relating to the collection of taxes, authorize this. 2. If the law does authorize it, then I think that in so far as it authorizes it, it is unconstitutional.

1. With reference to the first question, we have decided that a tax under the existing laws of this state is not merely a charge *in rem* ( *Gritchell* v. *Kreidler*, No. 2318 Mo. App. )[1] but a personal charge or impost against owners of property in respect of their property. *In re Life Assn. of America*, *ante*, p. 40. When the tax is assessed in respect of real property, the state asserts a lien in its favor against the property ; but this lien is not the impost itself ; it is but an additional security for the collection of the impost. On the contrary, it is made the duty of the collector to collect "all taxes" — not only those assessed in respect of personalty, but also those assessed in respect of realty — by distraining the personalty of the tax-debtor. Rev. Stats., sect. 6754. Obviously, he can exercise this power of distraint upon money, as well as upon other personalty of the tax-debtor. Under the direction of the court, it can be exercised upon money *in custodia legis*, as well as upon any other money. He is the

---

[1] The judgment in this case was afterwards set aside. — Rep.

plaintiff in this judgment, and, as such, he has the same control over the writ of *fieri facias* that the plaintiff in any other judgment has. When, proceeding to sell the property of the tax-debtor, lot by lot, according to the subdivisions in which it has been assessed, the sheriff has realized sufficient money to pay all the taxes, costs, and charges for which the judgment has been rendered, it is, in my opinion, his duty, in the absence of a contrary direction from the tax-debtor, to direct that the sale be discontinued, and to ask the court to apply the money which has thus been raised, to the payment of the taxes, costs, and charges upon all the lots, — in other words, to the satisfaction of the whole judgment; and it is the duty of the court to make such an order. Such a course satisfies fully the provisions of the law. It gives efficient operation to the collector's power of distraint; it gives the state its revenue; and it prevents a sacrifice of the remaining property of the tax-debtor.

2. But if the statute, as framed, does not admit of such a proceeding, — if, after the sheriff has sold enough of the debtor's property to pay all the taxes, costs, and charges, for which the judgment has been rendered, — the law still obliges the sheriff to proceed with the sale, no matter at how great a sacrifice of the property of the tax-debtor, till every lot has been sold against which the tax is a lien, — then I am of opinion that in so far as it has this operation, it is unconstitutional and void. It may not be possible to point to any provision in the constitution of this state which prohibits such a proceeding in terms. The framers of the constitution could not have foreseen that the legislature would ever attempt to authorize a proceeding by which the officers of the state could sell to A. an unlimited amount of property belonging to B., for a price however small, under the pretence of collecting the state's revenue, when the state's officer already had in his hands enough money of the property-owner to satisfy its demand for revenue. A general provision was placed in that instrument denunciatory of

such acts of oppression, namely : " That all constitutional
government is intended to promote the general welfare of
the people ; that all persons have a natural right to life,
liberty, and the enjoyment of the gains of their own in-
dustry ; that to give security to these things is the principal
office of government ; and that when government does not
confer this security, it fails of its chief design." Bill of
Rights, sect. 4. Without the aid of this provision, a law
which should have this operation would, in my opinion,
be void. For, to adopt the language of the supreme
court of the United States, in a celebrated case, — " It must
be conceded that there are rights in every free government
beyond the control of the state. A government which
recognizes no such rights, which holds the lives, the liberty,
and the property of its citizens subject at all times to the
absolute disposal and unlimited control of even the most
democratic depository of power, is after all but a despotism.
It is true it is a despotism of the many, of the majority,
if you choose to call it so, but it is none the less a des-
potism. It may well be doubted if a man is to hold all
that he is accustomed to call his own, all in which he has
placed his happiness, and the security of which is essen-
tial to that happiness, under the unlimited dominion of
others, whether it is not wiser that this power should
be exercised by one man than by many. The theory of
our governments, state and national, is opposed to the
deposit of unlimited power anywhere. The executive, the
legislative, and the judicial branches of these governments
are all of limited and defined powers. There are limita-
tions on such power which grow out of the essential
nature of all free governments. Implied reservations of
individual rights, without which the social compact could
not exist, and which are respected by all governments
entitled to the name. No court, for instance, would hesi-
tate to declare void a statute which enacted that A. and B.,
who were husband and wife to each other, should be so no
longer, but that A. should thereafter be the husband of C.,

and B. the wife of. D.   Or which should enact that the homestead now owned by A. should no longer be his, but should henceforth be the property of B." *Loan Assn.* v. *Topeka*, 20 Wall. 655, 662, 663. Among these limitations of power, the court held was a limitation of the right of taxation, so that it can only be used in aid of a public object, — an object which is within the purposes for which governments are established.

As this power cannot be exercised except for the purpose of raising revenue for public purposes, neither can it be exercised except so far as is *necessary* to raise such revenue.   When the state, through its officer, has sold so much of the debtor's property as is necessary to satisfy its revenue and the costs of collecting it, its power is exhausted. If, thereafter, it sells more, it commits an act of wanton despotism, such as cannot be tolerated in a free government, and such as the legislature cannot be presumed to have intended to authorize.   I coincide with the doctrine upon this subject expressed by the court of appeals of Virginia, that the power of the legislature to provide for the sale of land for the payment of taxes is limited to that object, and that a law which requires that the whole of the tax-debtor's land shall be sold in all cases, without regard to the fact that it may be divided without injury to it, and that the tax may be paid by the sale of a part of it, is unconstitutional.   *Martin* v. *Snowden*, 18 Gratt. 100 ; *Downey* v. *Nutt*, 19 Gratt. 59.   It has been said that, in the absence of any statute limiting the officer's right to sell, to so much as would be requisite to pay the taxes and charges, a restriction to this extent would be intended by law. *O'Brien* v. *Coulter*, 2 Blackf. 21.   Commenting upon this decision, Mr. Justice Cooley, in his work on Taxation, says : " Whether this is so or not is, perhaps, not very material, as it is not for a moment to be supposed that any statute would be adopted without this or some equivalent provision for the owner's benefit.   And such a provision must be

strictly obeyed. A sale of the whole when less would pay the tax, is void ; and a sale of the remainder after the tax had been satisfied by the sale of a part of it, would also be void, for the very plain reason that the power to sell would be exhausted the moment the tax is collected.'' Cooley on Tax. 343. In support of this doctrine he cites many decisions, including two of the supreme court of the United States.

I think this just and salutary principle ought to have governed the sale in this case. I do not think the legislature of this state ever intended that it should be departed from in the sale of land for taxes. I think this is implied in the plainest terms in the language of the section of the statute under which the sheriff proceeded in making this sale. It provides that '' the judgment shall state the amount of taxes and interest found to be due upon each tract or lot, and the year or years for which the same are due, up to the rendition thereof, and shall decree that the lien of the state shall be enforced, and that the real estate, or *so much thereof as may be necessary* to satisfy such judgment, interest, and costs, be sold, and a special *fieri facias* shall be issued thereon, which shall be executed as in other cases of special judgment and execution.'' Rev. Stats., sect. 6838. The provision of the Revised Statutes relating to the sale of land under execution in the case of private judgments, recites that '' when an execution shall be levied upon real estate, the officer levying the same shall divide such property, if susceptible of division, and sell so much thereof as will be sufficient to satisfy such execution, unless the defendant in the execution shall desire the whole of any tract or lot of land to be sold together, in which case it shall be sold accordingly.'' Rev. Stats., sect. 2368. I am clear that it never was contemplated by the legislature of this state, in authorizing any sale of land under execution, that more should be sold than, reasonably subdivided, should be found necessary to satisfy the execution. And I think it clear, whether regard be had for obvious principles of right, or for the meaning of the statutes above

quoted, that when, in any case, the sheriff has sold enough land to satisfy the execution in his hands, his power of sale is exhausted. If the writ in his hands is so framed as to require him to sell more, then, in so far as it contains such a requirement, it is void. If the judgment upon which the writ is based is couched in such terms as to require this, then, in so far as it requires it, it is void; and if there is a statute which authorizes the rendition of a judgment in such terms, in so far as it authorizes the rendition of such a judgment, it is also void.

I am not insensible of the difficulties which surround this question, nor do I seek to undervalue the reasons which have induced my learned brethren, after the very earnest attention which they have given to the subject, to come to the conclusion expressed in the opinion of the court. But are not these reasons reasons of inconvenience merely? And must such considerations outweigh the most important rights? In this case it seems that the lots which were sold after the sale of the first three were worth many times the value for which they were sold. In substance and effect, not a dollar of the money thus raised will go to swell the public revenue. The sale of the first three lots having provided sufficient money to pay the taxes, costs, and charges accruing on account of the whole property, all the money raised by the sale of the remaining lots must, under the terms of the statute, be handed over to the tax-debtor. It presents, then, to my mind, the simple case of a proceeding by which an officer of the state capriciously sells the property of one citizen to another citizen and hands the entire proceeds of the sale over to the former. That the proceeds of the sale are not more than one-tenth of the real value of the property, is not the mere fact in which consists the outrage. It would be scarcely less an outrage upon private right, if the property sold for the full value or for double its value. The citizen has a right to say whether he will keep his property or suffer it to be sold. It may be sold, perhaps entirely appropriated for the purposes of the pub-

lic revenue. It may be taken from him and given to another, to be used by that other for public purposes, upon paying him a just compensation for it. It may even be destroyed without paying him any compensation, when the public safety requires it, as to check a hostile invasion, or a conflagration. In all these cases he undoubtedly holds it subject to the paramount rights of society. But it cannot be taken from him and sold to another, although for its full value, and although he receive the proceeds of the sale, when such a sale is not necessary for the accomplishment of any purpose of government, or of public safety of utility.

I therefore think that we ought to reverse the judgment of the circuit court and remand the cause with directions to set aside the sale of all the lots except the first three. The collector could then proceed, under the power of distraint which he possesses, to appropriate the money in the sheriff's hands to the payment of the tax; and, if necessary, the court could aid him in the exercise of this power.

