$\sqrt{}$

## SYLVESTER STERLING *v.* E. B. BALDWIN, EXECUTOR OF WILLIAM QUIMBY.

### *Standing Trees. Sale. Statue of Conveyances.*

A sale of standing timber evidenced by a writing as follows:

"Sharon, August 24, 1864.
"Sold to William Quimby all the hemlock timber standing and down, east of Heselton's potato field on the minister lot, so called. Quimby is to have one year from next June to get the lumber off the land. Received one hundred dollars in full for the timber.　　　　　CALVIN S. ADAMS."

vested in Quimby good title to the trees with the right to take them away within the time specified. Previously said Adams conveyed to the plaintiff (Sterling) the land on which said trees stood, by a warranty deed dated June 30, 1864, and containing a reservation as follows: "Reserving to myself all the hemlock timber standing," etc., (describing the timber in question,) "with the right to cut and remove at any time within two years." Subsequently said Adams executed a quitclaim deed to the plaintiff, dated November 22, 1864, conveying, in these words, "All the right of timber I reserved in my deed to said Sterling on the 30th day of June, 1864, and meaning to include in this deed all the timber that is now cut and standing on said lot." *Held,* that Quimby's title was unaffected by said subsequent deed.

Our statute of conveyances considered and discussed.

TRESPASS for breaking and entering the plaintiff's close in Sharon, and cutting and taking away a quantity of hemlock trees. Plea, the general issue, and trial by jury, May term, 1868, Windsor county, BARRETT, J., presiding.

On the trial the plaintiff gave in evidence a deed from Calvin S. Adams to himself, dated June 30th, 1864, duly witnessed, acknowledged and recorded the same day, conveying to him the land in question, but containing a reservation in these words: "Reserving to myself all the hemlock timber standing northerly of a field

of potatoes planted and occupied this season by Jonathan Heselton, with the right to cut and remove at any time within two years." Also a quit-claim deed from the said Adams to himself, dated November 22, 1864, and duly witnessed, acknowledged and recorded the same day, by which the said Adams conveyed to the plaintiff in these words: "All the right of timber I reserved in my deed to Sterling, on the 30th day of June, 1864, and meaning to include in this deed all the timber that is now cut and standing on said lot." The plaintiff then gave evidence tending to prove that the said Quimby, in the month of June, 1865, entered upon the land so conveyed, and then and subsequently cut and took away a large number of hemlock trees, although the plaintiff twice forbid his so doing.

The defendant gave in evidence a writing in the words and figures following:

"Sharon, August 24, 1864.

"Sold to William Quimby all the hemlock timber standing and down, east of Heselton's potato field on the minister lot, so called. Quimby is to have one year from next June to get the lumber off of the land. Received one hundred dollars in full for the timber.

"CALVIN S. ADAMS,
"JONATHAN HESELTON."

The defendant gave evidence tending to prove that there was no other hemlock timber upon the minister lot, to which the description in this writing, or in the deeds to the plaintiff, could apply, excepting that which was cut by the defendant. The defendant offered to prove that the plaintiff knew at the time he purchased and took his deed aforesaid, dated November 22, 1864, that the defendant had bought and become the owner of the timber reserved in said deed, dated June 30, 1864. The court ruled *pro forma*, that the said writing gave to the said Quimby a right to enter upon the land named in the writing, and cut and take away the said hemlock timber, within the time named in said writing, notwithstanding the plaintiff's deeds aforesaid, and directed the jury to return a verdict for the defendant; to which decision and direction the plaintiff excepted.

*Washburn & Marsh*, for the plaintiff.

*W. C. French*, for the defendant.

The opinion of the court was delivered by

BARRETT, J.   In the case of *Buck* v. *Pickwell*, 27 Vt., 157, the question in judgment was whether a verbal contract for the sale of growing trees, made in 1830 or 1831, including an agreement that the vendee might act his pleasure as to the time when he should take them off, for which trees the purchase price was paid ·at the time of the trade, and which the vendee permitted to remain standing for twenty-one years, so vested the title and property in said trees in the vendee as to enable him to maintain an action of trespass for cutting them down, against a party who had, in the mean time, become the owner of the farm on which they were standing by an absolute deed of warranty without reservation, it was held that that was a contract for the sale of an interest in land, and was within the statute of frauds.   In the present case the contract is in writing signed by the vendor, and acknowledging the payment of the purchase price.   The statute of frauds does not intervene, therefore.   Neither that case, nor any of the cases cited in the learned opinion drawn up by BENNETT, J., suggests the idea that, if the contract of sale had been so in writing as to answer the requirement of the statute of frauds, it would not have been sufficient, as between the parties, to transfer the title and right of property in the trees.   Instead of this, indeed, the ground and theory of the reasoning in those cases is a virtual assumption that the contract would have had effectual operation to that end.   In *Buck* v. *Pickwell*, no notice was taken by BENNETT, J., of the distinction which seems to be established outside of Vermont, and clearly stated in note 1, Greenl. Cruise, 55, § 45 :   " The principle now most generally recognized seems to be this : that in contracts for the sale of things annexed to and growing upon the freehold, if the vendee is to have a right to the soil for a time for the purpose of further growth and profit of that which is the subject of sale, it is an interest in land within the meaning of the fourth section of the statute of frauds, and

must be proved by writing ; but where the thing is sold in prospect of separation from the soil immediately, or within reasonable and convenient time, without any stipulation for the beneficial use of the soil, but with a mere license to enter and take it away, it is to be regarded as substantially a sale of goods only, and so not within that section of the statute ; although an incidental benefit may be derived to the vendee from the circumstance that the thing may remain for a time upon the land."

It is likely enough that BENNETT, J., intentionally disregarded that distinction. But it seems quite clear that that case would have been properly decided as it was, if that distinction had been recognized and regarded, and the decision had been made with reference to it. See 6 N. H., 430. We are not supposed to give that opinion the force of authority beyond the very point of judgment. At the same time, for the purposes of the case before us, we have no occasion to determine whether, in *all* cases of the sale of growing trees, it is necessary that the contract should be in writing : for in this case the contract is in writing and is conceded to be fully answerable to the requirement of the law under the statute of frauds.

The important question is, was a *deed*, executed and perfected in all the respects provided by our statute for the " conveyance of lands or of any estate or interest therein," (Gen. St., ch. 65, § 1,) necessary in order to vest the property in those trees in Quimby ? Ordinarily deeds in common form do not embody the contract in its terms and details between the parties in effectuation of which a deed is executed and delivered. The deed is rather an instrument for transferring and assuring the title in pursuance of the contract of sale and purchase.

In 2 Wash. on Real Prop., 598, it is said, " A man may grant trees growing on his land without deed. So he may corn, etc. The law regards these things as so much of the character of chattels as not to require the formality of a deed to pass property in them." Shep. Touch., 231, is to the same effect. See *Olmstead* v. *Niles*, 7 N. H., 522, 526.

Our statute of conveyances was designed to provide a mode of conveyance by deed and record that should be effectual to transfer

and vest title to land, or any estate or interest therein, as against all persons, as well others as the very parties to the instrument, " without any other act or ceremony whatever." It proceeds in section four to prescribe the requisites of the instrument that should be thus effectual as against the world. But obviously it was not intended that, as between the parties to the contract of the sale of lands, or of any estate or interest therein, there could in no case be a transfer of property in land, or of any estate or interest therein, unless by an instrument made, executed, witnessed, acknowledged and recorded in the manner prescribed by said fourth section. It will be noticed in that section that the *acknowledging* and *recording* are just as much prescribed as the *signing, sealing* and *witnessing*. But by looking to the seventh section it will be seen that, by implication, a deed not acknowledged and recorded may, as against the grantor and his heirs, and in favor of everybody else, be good and effectual in law to hold lands in fee-simple, fee-tail, or for term of life, etc. The only effect provided by statute to flow from the lack of an instrument executed, acknowledged and recorded, as is prescribed in said section four, is contained and indicated in said section seven. It seems plain that section four, in connection with sections one and seven, was designed to provide a mode of conveyance that should assure title to land, and any estate or interest therein, in all cases in which by the law then existing, aside from the statute, a deed or its equivalent was necessary in order to constitute or effectuate the grant, or to transfer the title, but was not designed to make such deed necessary with reference to any subject matter, for the conveyance of which the common law in force at the time of the enactment of our statute of conveyance did not require a deed or its equivalent.

This, therefore, would leave the question, whether any specified interest in land could be granted, and conveyed otherwise than by the statutory deed, to be determined by such common law.

In this view, we think, there is no ground for doubt that the sale of the trees to Quimby, evidenced by the writing shown in the case, vested in him the property, with the right to take the trees away within the time specified. Indeed, as between him

and Adams, and the plaintiff, it would seem that the trees might well be regarded as mere chattels. The first deed of Adams to the plaintiff conveyed all the land, and every interest in the land, on which the trees were standing, except what was embraced in said reservation of the trees, with the right to cut and take them off within the two years. By that reservation they were virtually treated by the parties as personal property, in no way so partaking of the nature of realty as to require a deed as between them, in order to the transfer of the title to the trees from Adams to the plaintiff, or from Adams to any body else. This being so, of course a deed subsequently made by Adams to the plaintiff, which purports to cover and convey only the same property, could be of no greater efficacy than such a writing as Adams gave to Quimby would have been if it had been given to the plaintiff instead of such deed. The case must stand, then, as between the plaintiff and Quimby, upon the rights acquired by the plaintiff, by virtue of Adams' deed to him of November, 1864. In the first place, then, it is to be noticed that all of Adams' property in the trees, and his right to cut and take them off, had passed to Quimby by the sale of August 24, 1864. In the next place, it is to be noticed that Adams' deed to the plaintiff of November 24, 1864, is a mere quit-claim. It is further to be noticed, that even as against a subsequent *bona fide* purchaser, there was no necessity for a manual change of possession of the trees in order to protect a prior *bona fide* sale, nor any other change more than was wrought in the view of the law by the reservation in the first deed of Adams to the plaintiff, and the sale by Adams to Quimby. See *Fitch* v. *Burk*, 38 Vt., 683 ; *Hutchins et al.* v. *Gilchrist et al.*, 23 Vt., 82. It is also to be noticed that the plaintiff does not show himself to have been a *bona fide* purchaser, for he does not show that he paid any thing as the consideration for said quit-claim deed, the deed itself not being operative as evidence of such payment against one not a party to it, and against whom the plaintiff, as grantee in such deed, is seeking to assert rights, depending on the fact that such grantee in good faith had bought and paid for the property covered by said deed. The result is that, in the judgment of this court, Quimby got a good title to those trees by his

purchase of Adams, evidenced by said writing, and that such title was in no way affected by the deed of Adams to the plaintiff subsequently obtained.

In what we have thus said and held, we are not undertaking to hold or say any thing that would interfere with our system of conveyance and registry, as fixed by statute and carried out by the adjudications of the court.

This case does not at all bring into consideration the rights of *bona fide* purchasers, who take title by deeds duly executed, acknowledged and recorded, and who are not affected by the record, or in some other equivalent way, with the knowledge or effect of such a sale of growing trees standing upon the land covered by such deeds, as was made by Adams to Quimby in this case. For, as before suggested, the plaintiff was party to the virtual severance of the trees by the operation of the first deed, with its reservation, which he took from Adams, thus rendering the trees susceptible of valid sale by Adams without deed. So he could not be misled by the record, and if he would make himself certain whether he could get a good title to them by a subsequent purchase from Adams, it behooved him to keep track of the ownership by other means than merely what the land records of the town might furnish.

The judgment of the county court is affirmed.