ELMER E. BROWN *vs.* J. C. BISHOP.

Piscataquis.    Opinion March 9, 1909.

*Contracts.   Sales of Growing Timber.    Title.    Revocable and Irrevocable Licenses.*
*Construction.*

In seeking the intention of parties in business transactions preference should be given to intelligent and honest purposes rather than the reverse.

It is well settled that growing timber constitutes a part of the realty, but may be separated from the rest by appropriate reservation or grant, and when thus separated from the general ownership of the soil, so long as it remains uncut, it has all the incidents of real estate, and the same rules which govern the title and transfer of such property must apply to it.

It is the settled law of Maine that no present legal title to standing and growing timber passes by virtue of oral, or unsealed written contracts for its sale, to be cut and removed by the purchaser. Such oral or unsealed written contracts are held to be executory, for the sale of timber as personal property as and when it shall thereafter be severed from the soil, together with a license to enter upon the land for the purpose of cutting and removing it.

When a written contract for the sale of standing and growing timber is under seal, the°test to be used, in ascertaining whether it is a mere revocable license, or a license coupled with such an interest as renders it irrevocable, is the intention of the parties.

When a contract for the sale of standing and growing timber is in writing and under seal it is to be interpreted and effectuated according to the intention of the parties, as disclosed in the language of the instrument, and the mode in which it was made, considered with reference to the situation of the parties and the purpose to be accomplished, unless some established rule of law will be thereby violated.

October 22, 1906, the plaintiff and the defendant entered into a written contract, under seal, the material parts of which are as follows : "Know all men by these presents, that I Elmer E. Brown of Orneville in the County of Piscataquis, Maine, in consideration of the sum of three hundred and fifty dollars to me paid by J. C. Bishop on or before the first day of February 1907 do hereby agree, covenant and permit J. C. Bishop of Orneville said county and state to cut all hemlock fir spruce pine and cedar on my lot located in said Orneville known as the Whitney lot it being the same lots deeded to me by Dana H. Danforth of Foxcroft, and to enter on said lots with teams and men for the purpose of cutting said timber. It is hereby agreed that the lumber shall be cut this winter if possible and what remains uncut shall be cut the following winter. That the lumber shall be

cut so as to avoid destroying other lumber so far as possible." The specified consideration of $350 was paid within the time provided therefor. The defendant operated upon the land during the winter of 1906-7, but did not cut and remove all the lumber authorized to be cut under the agreement. September 9, 1907, the plaintiff forbade the defendant in writing " entering with teams and men for the purpose of cutting any lumber or doing any work of whatever nature on my lots of land known as the Whitney land." Notwithstanding this notice, however, the defendant thereafter entered upon the land, in the fall of 1907, and yarded 150 M of the lumber specified in the agreement, and thereupon the plaintiff brought an action of trespass quare clausum against the defendant.

*Held :*  1. That the manifest intention of the parties, as gathered from the language of their contract, interpreted in the light of their situation and the object they had in view, was not the sale and purchase of a mere revocable license to cut the timber, but the sale and purchase of the timber itself as it then stood, to be taken off within the time provided therefor.

2.  That although the instrument in which the contract is expressed does not contain in all its parts the technical words customarily used in conveyances of real estate, yet, it being in writing and under seal, it is sufficient to effectuate the original honest intention of the parties, without infringing any established rule of law applicable in this State to the transfer of an interest in real estate between the original parties.

3.  That by virtue of that instrument the defendant acquired a present legal title to the growing timber mentioned therein, defeasible, however as to so much thereof as he should not cut during the period provided therefor, and that the express license to enter upon the land for the purpose of cutting and removing it, could not, as between the parties, be revoked by the plaintiff while the contract was in force.

4.  That the words "if possible" as used in the contract are to have a reasonable interpretation, having reference to the cutting and removing of the lumber as a business undertaking.

5.  That the lumber left uncut on the lot at the end of the winter of 1906-7 was so left because it was not reasonably possible, within the meaning of the contract, to cut it that winter.

6.  That judgment must be for the defendant.

On report.  Judgment for defendant.

Action of trespass quare clausum brought in the Supreme Judicial Court, Piscataquis County.  Plea, the general issue with brief statement as follows:  "That any entry upon the lands of the plaintiff or acts complained of in plaintiff's writ and declaration (if any) were done by the defendant by the consent and under the license and permission of the plaintiff."

Tried at the January term, 1908, of said court. At the conclusion of the testimony, the case was reported to the Law Court for decision upon so much of the evidence as was "competent and legally admissible."

The case appears in the opinion.

*W. A. Johnson,* and *Martin & Cook,* for plaintiff.

*M. L. Durgin,* and *Ira G. Hersey,* for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, SPEAR, CORNISH, KING, BIRD, JJ.

KING, J.    Action of trespass to real estate reported to the Law Court. On October 22, 1906, these parties entered into the following written contract:

"Timberland Permit

Know all men by these Presents, that I, Elmer E. Brown of Orneville in the County of Piscataquis, Maine, in consideration of the sum of three hundred and fifty dollars to me paid by J. C. Bishop on or before the first day of February, 1907, do hereby agree, covenant and permit J. C. Bishop of Orneville, said County and State, to cut all hemlock fir spruce pine and cedar on my lot located in said Orneville, known as the Whitney lot it being the same lots deeded to me by Dana H. Danforth of Foxcroft, and to enter on said lots with teams and men for the purpose of cutting said timber.

It is hereby agreed that the lumber shall be cut this winter if possible and what remains uncut shall be cut the following winter, That the lumber shall be cut so as to avoid destroying other lumber so far as possible.

Sealed with our seals dated this twenty-second day of October, 1906.

Signed, Sealed and Delivered          ELMER E. BROWN (LS)
        in presence of
        R. W. BROWN.                     J. C. BISHOP (LS)"

The specified consideration of $350 was paid within the time provided therefor. · Bishop operated upon the land during the winter of 1906-7, but did not cut and remove all the lumber authorized to be cut under the agreement.

On September 9, 1907, Brown forbade Bishop in writing "entering with teams and men for the purpose of cutting any lumber or doing any work of whatever nature on my lots of land known as the Whitney land."

Notwithstanding this notice Bishop thereafter entered upon the land, in the fall of 1907, and varded 150 M of the lumber specified in the agreement, for which acts this action of trespass is brought.

The defendant pleads in justification a right to do the acts complained of by virtue of the written instrument of October 22, 1906. In answer to this justification the plaintiff says: First, that the right granted by this instrument was a revocable license to cut and remove the timber within a specified time, which was revoked by him prior to the trespass; and, Second, that the defendant's right to cut the timber terminated at the end of the winter of 1906-7 because he did not cut all the timber that winter.

I. The determination of the first question presented involves the interpretation of the contract of the parties and the operation to be given to it. Was that contract a mere revocable license to Bishop to enter the plaintiff's land and cut the timber, or a grant of such an interest in the growing timber, during the period for its removal, as precluded Brown from revoking the express license to enter and cut it during that period?

It is well settled that growing timber constitutes a part of the realty, but may be separated from the rest by appropriate reservation or grant, and when thus separated from the general ownership of the soil, so long as it remains uncut, it has all the incidents of real estate, and the same rules which govern the title and transfer of such property must apply to it. *White* v. *Foster*, 102 Mass. 375, *Emerson* v. *Shores*, 95 Maine, 237. It is also well settled, as stated in *Emerson* v. *Shores*, supra, that "a present legal interest in real property can only be granted in this State by an instrument under seal."

Accordingly it is the settled law of this State, and by the weight of authority elsewhere, that no present legal title to standing and growing timber passes by virtue of oral, or unsealed written, contracts for its sale, to be cut and removed by the purchaser. Such oral or unsealed contracts are held to be executory, for the sale of the timber as personal property as and when it shall thereafter be severed from the soil, together with a license to enter upon the land for the purpose of cutting and removing it. *Pease* v. *Gibson*, 6 Maine, 81; *Pierce* v. *Banton*, 98 Maine, 553; *Emerson* v. *Shores*, 95 Maine, 237; *Banton* v. *Shorey*, 77 Maine, 48; *Claflin* v. *Carpenter*, 4 Met. 580; *Drake* v. *Wells*, 11 Allen, 141; *White* v. *Foster*, 102 Mass. 375; *Martin* v. *Johnson*, 105 Maine, 156; *Burnham* v. *Austin*, 105 Maine, 196. Such license, however, while it continues executory, as to all timber not cut under it, is revokable by the licensor.

It is also true, that if the contract expressed in a written instrument is but a mere license to do some act or acts on the licensor's land, without an intention that the licensee is to have possession of any estate therein, the affixing of a seal thereto would not necessarily change the contract to a conveyance of an interest in real estate. If the contract is under seal, then the test to be used, in ascertaining whether it is a mere revocable license, or a license coupled with such an interest as renders it irrevocable, is the intention of the parties.

This contract under which the defendant claims to justify his acts, being in writing and under seal, is to be interpreted and effectuated according to the intention of the parties, as disclosed in the language of the instrument, and the mode in which it was made, considered with reference to the situation of the parties and the purpose to be accomplished, unless some established rule of law will be thereby violated.

It must be conceded, we think, that the subject matter of this contract was "all hemlock fir spruce pine and cedar" then standing on the Whitney lot; and that the purpose of the contract was to effectuate a sale of that timber, as a whole, from Brown to Bishop, for a fixed and definite sum of money to be paid at a near and

definite time. The terms of the contract were all concluded, no details being left to be settled thereafter. No measuring or survey-ing of the timber was to be done, and Bishop was to have "all" the trees of the kinds specified large or small, he agreeing to cut them within the time provided. We think the words "to cut" as used in the instrument import the same right as "to cut as his own," or as "to have," and accordingly the contract should be held to mean the same as it would if the language used had been "do hereby agree, covenant and permit J. C. Bishop . . . . to have all hemlock fir spruce pine and cedar on my lot . . . . and to enter with teams and men for the purpose of cutting said timber."

We cannot accede to the proposition that these parties in that situation, and thus manifestly agreeing, intended that Bishop was to get, as the only consideration for his money, a mere license to cut the timber which Brown could revoke at any time. To hold such to have been their intention is to discredit both ; for if Bishop entered into the contract with that understanding he was wanting in ordinary business intelligence, and if Brown intended to reserve to himself the right to withhold from Bishop that for which his money was to be paid he, too, was wanting in ordinary business integrity. In seeking the intention of parties in business transactions preference should be given to intelligent and honest purposes rather than the reverse.

Obviously, then, the intention of these parties, as gathered from the language of their contract, interpreted in the light of their situation and the object they had in view, was not the sale and purchase of a mere revocable license to cut the timber, but rather the sale and purchase of the timber itself as it then stood, to be taken off within the time provided therefor.

Although the instrument in which the contract of the parties is expressed does not contain in all its parts the technical words customarily used in conveyances of real estate, yet, we are of opinion that it is sufficient to effectuate the original honest intention of the parties, without infringing any established rule of law appli-cable in this State to the transfer of an interest in real estate between the original parties.

But the language of this instrument is not without significance upon this point. Its beginning and its ending technically conform to that of deeds of conveyance. It is "Signed, Sealed, and delivered" in presence of a witness. It is not acknowleged or recorded, but neither is an essential of the validity of a deed of conveyance between the original parties in this State. It does not contain the words "grant" or "convey," but technical words are not indispensible to constitute a grant, if only such an intention is disclosed, as we have found to be the case here.

This case is clearly distinguished from those, cited for plaintiff, in this and other States, like *Emerson* v. *Shores*, supra, where parol or simple contracts for the sale of growing timber have been construed as not intended by the parties to convey an interest in the growing timber as such, but as executory contracts for the sale of the timber as a chattel after it is severed from the soil, in the important fact that here the contract is under seal. Those cases, therefore, give no support to the plaintiff's position that no interest in the standing trees was here conveyed; but, on the other hand, in so far as they indicate that the want of a seal was the controlling reason for the necessary construction there given, they are in full accord with the conclusion here reached. This distinction between sealed and unsealed contracts for the sale of growing trees is not to be overlooked.

The very fact that a contract was executed under seal is to be regarded in its interpretation and may be decisive of the question whether it conveys an interest in real estate, for, as aptly stated in *White* v. *Foster*, 102 Mass. 379: "It is not true, therefore, as claimed by the demandant, that, if the contract is in writing and under seal, no other or greater interest passes than would pass by the use of the same language in an oral sale. The subject matter of the contract is the same in both, but the contracts themselves may receive a different interpretation."

There are but few cases in this State, to which our attention has been directed, involving the interpretation and effect to be given to contracts under seal relating to the sale of growing timber, and in

none of them do we find any suggestion that such a contract as is now under consideration should be construed as a mere revocable license, between the original parties.

In the early case of *Pease* v. *Gibson*, supra, an unsealed obligation, for the sale of growing timber was expressly referred to in a reservation in a deed of the land. The instrument itself was no more formal than the one now under consideration. The only point decided in the case, however, was that the rights conferred by the obligation did not afford a justification for an entry upon the land almost four years after the expiration of the period allowed for removing the timber. The court said, however: "But if we were at liberty to consider a sale of the timber as proof of the license pleaded, still our opinion would be that it was only a conditional sale; that is, a sale of the timber that Howard or his assignee should cut and carry away within the two years mentioned in the license."

In *Freeman* v. *Underwood*, 66 Maine, 229, the contract was under seal, but much more formal than this, combining with an unequivocal sale of the timber, grass and berries then growing upon the land and all "which may be found or grown thereon for the space of ten years" a lease of the land for that period. The action was trover by the vendee against persons who had received berries picked by trespassers, and it was held that "when the berries were taken from the bush by unauthorized persons they were the property of the plaintiff." In the opinion the late Chief Justice PETERS said: "But we think it clear that the writing amounts to an executory sale of the blueberries, which would make them his when picked from the bush, or perhaps when merely grown."

In *Donworth* v. *Sawyer*, 94 Maine, 242, the instrument was a deed conveying in addition to other real estate "all the pine and spruce timber standing on (land described) to be taken off from time to time to suit their convenience," with the provision that if any of the lots should be sold the timber thereon "shall be removed the next lumbering season after notice is given . . . or as soon thereafter as may be practicable." It was conceded that title to

the standing timber passed, and the question decided was that only the pine and spruce standing on the land at the time of the sale passed.

The plaintiff relies, however, upon authorities in other jurisdictions, citing especially the following cases in which the contract was under seal; *United Society* v. *Brooks*, 145 Mass. 410; *East Jersey Iron Co.* v. *Wright*, 32 N. J. Eq.; 248, and *Fish* v. *Capwell*, 18 R. I. 667.

In *United Society* v. *Brooks*, supra, the action was by the land owner for breach of a contract under seal relating to the sale and purchase of growing timber, the plaintiff claiming that the defendant violated his contract in not cutting as much lumber as he agreed to, and the point decided was that the value of the timber left uncut should not have been included in the damages as the title to it did not pass to the defendant under the contract. It is made clear in the opinion that the court held that no title to the standing trees passed because such was not the intention of the parties as disclosed in their contract, interpreted in the light of their situation and the object in view. In reference to the provisions of the contract it is said: "Then followed provisions as to the quantity to be cut in each year, the prices to be paid per cord for the bark, and per thousand for the hemlock lumber and for the spruce timber, and the time of payments. Measurements were to be made by the plaintiff or its agent, at places specified in the contract, with notice to the defendant in all cases to enable him to be present at them. Other details for proceeding in execution of the contract were inserted . . . . . The instrument in all its parts seemed to look to future action and future results, rather than to a present change of title."

This language of the opinion so aptly distinguishes that case from the one at bar that further reasons why it is inapplicable as an authority against the construction which we make of the contract now before us is unnecessary.

Herein is to be found the distinction between the ordinary timber permit or stumpage contract and the one at bar. In this contract the amount of the consideration which the vendee was to receive

was fully fixed, and practically paid, at the execution of the con-
tract, while in the timber permit only the means of determining the
amount of the stumpage thereafter is the essential thing agreed
upon. Here the vendor has no concern as to how much timber the
vendee may cut, but the amount which the licensee may cut under
the usual timber permit is the chief concern of the licensor, for the
amount of money he will receive depends wholly upon it. In this
case the plaintiff parted with all his interest in the subject matter of
the contract—the standing timber sold, having no longer any care
as to the manner of its cutting. The licensor in the ordinary
timber permit still retains a vital interest in the subject matter of
the license, for his profits depend upon the efficiency and fairness
with which the license is executed. A careful consideration of these
important distinctions will show that the case at bar falls entirely
without that line of cases involving the rights of parties under the
usual stumpage contract or timber permit.

In *East Jersey Iron Co.* v. *Wright,* supra, the action was
founded on an agreement under seal granting the right of raising
and removing ores from certain lands, the licensee to pay twenty-
five cents as stumpage for each ton of good ore so removed. It
was held that the license was revocable because no interest in the
land passed, and further that the licensee had waived his right.
But this case is not applicable here for the reasons above stated, we
think. It was a contract in which it was provided that the benefit
thereunder to the licensor was to depend upon the acts of the
licensee in the exercise of his rights under the contract.

The case of *Fish* v. *Capwell,* supra, is directly in point and flatly
in conflict with our views and conclusions as herein expressed. The
instrument there employed was under seal containing these words:
"I have sold to . . . all the standing wood on a certain
lot . . . To have and to hold the same to the said . . .
their heirs, executors and administrators, with two years from the
date hereof to cut and remove said wood in, they having paid me
the sum of Fifty dollars in full for said standing wood."

It was held that the instrument was not to be construed as pass-
ing any interest in the land, but as an executory contract or parol

license which was revocable. The decision seems to be put on the ground that any contract for the sale of growing trees should be construed as an "executory contract for trees to be severed from the land." No suggestion was made that the instrument was not sufficient in form to pass an interest in land, for it is said: "In this case there was a written instrument which was substantially a deed of the trees." In the opinion it is said that "the greater number of authorities" support the other view.

Any attempt here to analyze and distinguish the numerous, and somewhat conflicting, decisions involving the construction of contracts for the sale and purchase of growing trees would be impracticable. It will be found that in many of them the only question presented was whether the contract was sufficient to satisfy the statute of frauds; in many others the only point raised was whether the vendee acquired such an absolute title to the trees as would protect him in cutting them after the expiration of the period provided therefor in the contract, or only a title defeasible as to such trees as he did not cut within the specified period. Neither of those questions are involved here. This contract is in writing and under seal, and the alleged cutting was within the period provided therefor. The following are some of the numerous cases where under instruments similar in form to the one now under consideration it has been held that an interest in real estate passed. *Kingsley* v. *Holbrook*, 45 N. H. 318, *Sterling* v. *Baldwin*, 42 Vt. 306, *Williams* v. *Flood*, 63 Mich. 487, *Dennis Simmons Lumber Co.* v. *Corey*, 140 N. C. 462. See also cases collected in the exhaustive note in 6 L. R. A., N. S., 468.

It is the opinion of the court, that by the instrument of October 22, 1906, Bishop acquired an interest in the growing timber mentioned therein, defeasible, however, as to so much thereof as he should not cut during the period provided therefor, and that the express license given to him to enter upon the land for the purpose of cutting and removing it could not, as between the parties, be revoked while the contract remained in force. Such construction gives effect to the manifest intention of the parties, is not contrary

to any judicial authority in this State, and is in harmony with the best-considered cases elsewhere.

2. The contract provides that the timber shall be cut the first winter, "if possible." The justification of the alleged trespass depends upon proof of the fact that it was not possible within the meaning of the contract to cut all the timber the first winter. The burden of establishing that fact is on the defendant.

The lexical meaning of the word "possible" is "capable of being done; not contrary to the nature of things." The condition of this contract as expressed in the words "if possible" is to be interpreted with reference to the thing to be done, the cutting and removing of the trees as timber.

If circumstances over which the defendant had no control obstructed the work, such as no snow on which to do it, or too much snow with no frost in the ground, so that in the nature of the thing it was reasonably incapable of being done, or if done, under those conditions and because of them, it would necessarily be at a cost greater than the value of the lumber, then the condition of the contract was complied with. But if the lumber was left uncut because of the neglect of the defendant to provide necessary teams, men and other equipments for the work, or to prosecute it with energy and skill to completion, then, we think, the condition of the contract was not complied with.

The defendant contends that a considerable portion of the lot—about one hundred acres out of four hundred—was bog or low land, timbered like the rest, from which it was impossible to cut and remove the timber because "There was no frost whatever. We couldn't get teams over it, it was impossible." That the trees left uncut were substantially all on this low land, those left on the higher ground being so situated that they could not be cut except in connection with operating over the low land.

If this contention be true, then, we think, it will satisfy the condition of the contract. The plaintiff, however, takes the opposite position, maintaining that the defendant has much over stated the area of the low land, that there is practically no growth on it which defendant was entitled to cut, that the uncut trees are chiefly on the

higher ground, and that the real reason why the timber was not all cut the first winter is that defendant neglected to procure enough teams and men and properly carry on the work.

Space here will not permit any considerable statement of the conflicting testimony upon this question of fact. Unfortunately we are deprived of the opportunity of seeing and hearing the witnesses, and judging from their appearance of their capacity, fairness and credibility. We must determine the issue from the evidence as it appears on the printed page.

The defendant is corroborated by his son, Morris Bishop, who says: "And we yarded to the swamp or bog as far as we could for the mud and mire; in fact, we yarded one yard on that side of the road that I swamped in the mud, the yard, and couldn't yard only about half of it on account of the mud. We had to leave it. . . . There is a wide ravine that makes down through the lot north and south, some places forty rods wide, that was miry and wet and the horses couldn't go on it."

Lyndon C. Fowles, who hauled some of the lumber, also corroborates the defendant as to the low land and bog, and, as to its character at the time, he says: "One trip we got our horses into the mud and we had to unload our load, get the horses and sled out as best we could, and twitched the logs up one to a time, or two, as we could reach them with the chains, up on to the hard ground to load them."

Charles Green, who worked for the defendant, says: "There was no frost, very muddy low land." James H. Greenleaf, another workman, says: "The swamps wasn't froze and the snow was very deep." John Page says: "they (the swamps) were very muddy and deep snow," and that they were not frozen at any time during the winter. Dustin Page also says: "It wasn't froze . . . Well I can't say as for water, it was all mud."

In answer to this the plaintiff presents the testimony of several witnesses who say, in substance and effect, that the winter of 1906-7 was "a very good winter" for lumbering; that in their operations on other lands they experienced no difficulties from lack of frost or too deep snows; that they have seen the Whitney lot, either since

or before the winter of 1906-7, and saw there no material amount of bog or low land.    Mr. Farris, who went to the lot with the plaintiff in the fall of 1907, says:    "I saw no places but what I could put a horse at any time and yard logs any time of year. I didn't see any thing to hinder a man."

In considering the conflicting testimony of witnesses of equal capacity and credibility that of those who have had the better opportunity for observing and knowing the actual conditions as they existed at the time is the more satisfactory.

The plaintiff's witnesses disclose the condition of the territory as it appeared to them seen at another time and under different conditions.    The defendant and his witnesses describe the actual conditions existing at the time as they saw and experienced them.

We have carefully considered all the evidence upon this question and it is the opinion of the court that the defendant has sustained his burden and established the fact that the lumber left uncut on the lot at the end of the winter of 1906-7 was so left because it was not possible, within the meaning of the contract, for the defendant to cut it that winter.

It follows as the conclusion of the court that the alleged acts of trespass were authorized and justified under the rights acquired by the defendant in the contract of October 22, 1906.

This conclusion is also manifestly equitable.    There is no suggestion of any fraud, misrepresentation, or other evil act of the defendant in the procurement of that contract.    The plaintiff sold the timber for an agreed price and received his pay.    It was in the contemplation of the parties that the cutting and removing of it might from necessity extend over to the second winter.    Such necessity, in the opinion of the court, arose; and the result of the conclusion here reached is that the defendant gets only what he bought, and what at the time the plaintiff intended for him to have. Accordingly the entry will be,

*Judgment for the defendant.*