# Graham Aviation Company v. City of Johnstown

Before McCann, P. J., McKenrick and Griffith, JJ.
*Spence, Custer, Saylor & Wolfe,* for plaintiff.
*Elvin Teitelbaum,* for defendant.

GRIFFITH, J., September 19, 1949.—This is a case stated, submitted to the court on an agreed statement of facts.

On November 22, 1944, defendant, the City of Johnstown, as lessor, and plaintiff, Graham Aviation Company, as lessee, executed a lease prepared by the then city solicitor, wherein the city leased to the lessee the Johnstown Municipal Airport for the term of three years "beginning January 1, 1945, and ending December 31, 1947." In accordance with the requirements of the lease, the lessee erected a combined administration and shop building and an airplane hangar on the premises. In addition, the lessee converted a frame structure into a caretaker's house after authorization by the city.

The lease required Graham to make certain improvements during the year 1945, but it was unable to obtain a permit from the War Production Board at that time,

and therefore construction was finally begun on April 29, 1946, and the improvements were substantially completed and became usable on March 1, 1947. These improvements cost the lessee $109,630.74, and the city reimbursed Graham in the sum of '$2,000, which amount it had received from the County Commissioners of Cambria County.

The time for the parties to determine whether the lease should be renewed for a further term of 12 years was fixed as December 31, 1947, but was extended for 60 days on December 16, 1947, by agreement of the parties, and later was extended on February 28, 1948, and finally on March 15, 1948, an agreement was entered into between the parties to enter a friendly law suit and for the operation of the airport by agreement pendente lite, the operation losses, if any, in the meantime to be borne by the city.

During the negotiations for renewal, the city on March 10, 1949, offered to renew the lease at a rental of $1 a year but refused to agree to share the losses as well as the profits, as was suggested by Graham. Graham refused the city's offer to renew at an annual rental of $1 on account of the fact that it had sustained substantial net operating losses during the three-year term of the lease and felt that similar losses were inevitable in the future. As a result, the parties were unable to agree upon a renewal of the lease.

The sixteenth paragraph of the lease provided that if the parties were unable to agree upon renewal the city should acquire title to the improvements erected and paid for by the lessee and reimburse the lessee "at cost, less depreciation, based upon a life of fifteen years". Graham demanded payment for the improvements erected by it at the airport, which the city refused to pay, contending that Graham as lessee was required to accept the city's offer to renew at an annual rental of $1.

The city's contention is that the lease was, in effect, a lease not for 3 years but for 15 years, and that after the 3-year trial period had elapsed, during which time no rental was to be paid, the rental was to be agreed upon between the parties, but that all the other terms and conditions of the lease were fixed; that either party had a right to cancel the lease after the three-year trial period, but for one reason only, that is, the failure to agree upon the amount of the rental if the other party's demand in regard to rental was unreasonable; that since the city as lessor had offered to accept a nominal rental of $1 a year, the lessee had no ground for cancellation.

On the other hand, Graham's contention is that the lease was a three-year lease only and that in the absence of bad faith neither party was required to agree to a renewal for an additional 12-year period, and that in the event that no renewal was mutually agreed upon, the city was obliged to reimburse Graham for the improvements erected by the latter as provided for in the lease.

The pertinent provisions of the lease (by paragraphs) are as follows:

2. *"The term of this lease is three years,* beginning January 1, 1945, and ending December 31, 1947."

3. "This lease shall be renewable . . . *for a further term of twelve years . . . if agreeable to the parties,* and upon the terms and conditions hereinafter set forth."

4. There shall be no rental for the three-year term, which shall be a trial period to secure data to determine a "proper" rental equivalent to a percentage of lessee's net profits *"in case the lease is renewed for a further term of twelve years."*

5. Lessee agrees to erect certain buildings and improvements.

7, 8, 9. The city agreed to run electric lines to the airport, provide a water supply and provide bituminous aprons.

14. "Prior to December 31, 1947, *the parties shall determine whether this lease shall be renewed* for a further term of twelve years . . . operating expenses and overhead costs shall be projected into the renewal lease, *if the lease is renewed.*"

15. "*The parties shall agree, if possible, upon the renewal* of the lease for the twelve year term . . . and the rental to be paid . . . shall be a sum of money equivalent to the percentage of the net profits which the parties shall have agreed upon as the rental to be paid to the City . . . *the parties may by agreement base the amount of such rental upon gross profits or upon any other basis to which they may agree.*"

16. "*If the lease is renewed* for a further term of twelve years, all the other terms of the lease except the rental shall continue in effect. *If the parties are unable to agree upon the renewal of the lease, the City shall acquire title to all of the improvements erected* and installed at the airport under this lease. *The City shall reimburse the lessee* at cost, less depreciation, based on a life of fifteen years . . ." (Italics supplied.)

It is obvious from a perusal of the lease that its term was three years only and that its renewal for the additional period of twelve years depended upon the mutual agreement of both parties. The phrases "if agreeable to the parties", "in case the lease is renewed", "the parties shall determine whether the lease shall be renewed", "if the lease is renewed", "the parties shall agree, if possible, upon the renewal", and "if the parties are unable to agree upon a renewal of the lease", are all indicative of the fact that mutual consent was contemplated before a renewal could be had.

In this connection see Williston on Contracts, rev. ed., vol. 1, p. 131, sec. 45:

"Since either party by the very terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise."

"On this ground clauses in leases containing renewal covenants leaving the renewal rental for the future agreement of the parties are in general held unenforceable for indefiniteness and uncertainty."

We may not now refer to the preliminary negotiations between the parties which occurred before the execution of the lease on November 22, 1944, although the statement of facts in the case stated refers to certain matters preceding the execution of the lease: Gianni v. Russell & Co., Inc., 281 Pa. 320.

In spite of all the other language contained in the lease above quoted and referred to, defendant believes that the wording of the fifteenth paragraph that "the parties shall agree, if possible, upon the renewal of the lease for the twelve year term" firmly binds the lessee to agree to such renewal since the lessor offered to renew for the nominal rental of $1 a year. Had the phrase "if possible" been omitted there would be more force to defendant's argument that the word "shall" was used in a mandatory sense and should be interpreted as meaning "must". In this event, defendant's citations supporting the rule requiring a compulsory interpretation when the word "shall" is used without qualifying words would have more pertinence.

As we view it, the qualifying phrase "if possible" materially weakens the contention that the word "shall" was used with mandatory significance.

Defendant's brief quotes the following from the case of Brown v. Bishop, 105 Me. 272, 74 Atl. 724, 729:

"The lexical meaning of the word 'possible' is 'capable of being done; not contrary to the nature of

things.' The condition of this contract, as expressed in the words 'if possible', is to be interpreted with reference to the thing to be done, the cutting and removing of the trees as timber."

In that case the contract provided that: "the lumber shall be cut this winter if possible . . ." However, the court said that if circumstances over which defendant had no control, such as no snow or too much snow, obstructed the work so as to render the removal of the timber during the first winter either impossible or that it could be done only "at a cost greater than the value of the lumber, then the condition of the contract was complied with." Hence the court there recognized that the necessity of operating at a loss relieved the lessee from his obligation "to cut this winter, if possible". So in the instant case, even if other language favoring plaintiff were not contained in the lease, we believe the phrase "the parties shall agree, if possible", does not bind the lessee to accept the city's offer to renew at a nominal rental in view of the stipulated fact that Graham had sustained a substantial net operating loss during the three-year term, and since it was agreed that "it (Graham) felt that a similar substantial net operating loss was inevitable in every future year". Because of the stipulated facts we need not consider, therefore, what the situation might have been if the losses sustained had been occasioned by neglect, poor management or lack of energy and skill on part of the lessee.

Defendant relies upon Rutgers v. Hunter, 6 Johnson Chancery Rep. (N. Y.) 215, Trustees of Columbia University v. Kalvin, 250 N. Y. 469, 166 N. E. 169, and Crystal Amusement Co. v. Potter Title & Trust Co. et al., 281 Pa. 47. In these cases the landlord had an option to buy the improvements erected by the lessee and bound himself to renew the lease if he chose not to buy. Here, however, the lease provided

that the city should reimburse the lessee if both parties "are unable to agree upon the renewal". Moreover, the lease provided what should happen if the parties were unable to agree, that is, the city should acquire title to the lessee's improvements and pay for them. This is not such a case as Kaufmann v. Liggett, 209 Pa. 87, where the lessee had no remedy to recover for his improvements when the lessor failed to renew as agreed, and the court thought that the lessor should extend the term of the lease and prevent the tenant from suffering undue hardship.

Defendant refers to Tiffany on Landlord and Tenant, vol. 2, p. 1536, sec. 224, to the effect that when a lessor has an option to renew a lease the lessee is bound to accept the renewal if tendered. Here, however, the renewal is subject to the agreement of both parties.

In these and other cases cited by defendant in this connection, it will be seen that the tenant had an option to renew. Here neither the tenant nor the city had such option, but renewal was predicated upon an agreement of both parties. Just as the lessee failed to agree on a renewal, so the city could have refused to renew, at least after making an effort in good faith to do so, although in that event it would, of course, have been required to purchase lessee's improvements. As will be seen by a reference to the portions of the stipulations above quoted, there is no suggestion that the lessee did not bargain in good faith nor that it refused to agree upon a renewal for any reason other than that it had sustained substantial operating losses during the trial period and believed that similar losses were inevitable in the future.

Defendant suggests that by reason of Graham's sublease of the restaurant business at the airport to Edward F. Rex and its offer of a lease to Transcontinental

and Western Airlines, Inc., for periods in excess of the three-year term, the lessee has construed its lease with the city to be a 15 year and not a three-year lease. Since we find the lease unambiguous, the construction placed upon it by the parties is not material. Moreover, it will be observed that the Rex lease was subject to cancelation by either party upon 90 days' notice and, therefore, was in effect a 90-day lease, and the TWA lease was never executed by the latter, and thus never became a binding contract.

We are satisfied, therefore, that the lessee, bargaining in good faith with the lessor, was entitled under the terms of the lease to refuse to accept the lessor's offer to renew the lease for an additional 12-year period at a rental of $1 per year, and that as a result the lessor must reimburse the lessee for the improvements erected and paid for by the lessee on the lessor's premises in accordance with its agreement so to do in the sixteenth paragraph of the lease.

There remains to be considered the question as to whether the depreciation to be computed upon the lessee's costs of the improvement based upon a life of 15 years is to commence March 1, 1947, the date when the improvements were substantially completed and became usable, or whether the computation of such depreciation should commence on January 1, 1945, as contended for by the city, and whether the city is bound to reimburse Graham for the improvements to the caretaker's house. It was agreed that depreciation should be taken until January 1, 1948, only.

We do not believe plaintiff is entitled to compensation for improvements made by it to the caretaker's house. These improvements cost plaintiff $5,640.96, of which defendant paid the sum of $2,000, which it had received from the Cambria County Commissioners, leaving a net amount of $3,640.96.

Under paragraph 5 of the lease the lessee was required to erect "buildings and structures, such as hangars, administrative office, service and repair shops, refreshment and restaurant buildings necessary to provide the standard equipment to comply with the requirements of the Civil Aeronautics Administration, Department of Commerce, U. S. A., and to make the premises available for use as a public airport and landing field."

Paragraph 16 of the lease provided that if the parties were unable to agree upon a renewal of the lease, the city should acquire title to and reimburse Graham for "all of the improvements erected and installed at the airport under this lease." As we view the matter, the work done on the caretaker's house was not an improvement "erected and installed . . . under this lease."

The lessee was required by the terms of the lease to complete the buildings mentioned in the fifth paragraph "within the first year of the term". The improvements to the caretaker's house were obviously not in this category. It appears from the stipulations agreed upon at a meeting of the city council on April 2, 1946, the lessee's manager appeared and then for the first time recommended the improvements to a frame house located on the premises, because it would be advantageous to have an employe reside there. The property cared for by the caretaker continued to be the property of Graham for the three-year term.

In October 1946 the council agreed to permit the lessee to make such improvements and turned over to the lessee the sum of $2,000 which has been received from the Commissioners of Cambria County for this purpose.

It is clear that the improvements to the house were not contemplated by the lease agreement and that the

city did not agree under the terms of the lease to reimburse Graham for the same.

The city believes that a depreciation based upon a life of fifteen years should be computed from January 1, 1945, and bases its contention on the theory that the parties intended to amortize the cost of the buildings over a period of 15 years ending December 31, 1959, regardless of the date on which they were erected and placed in use. It is agreed that the buildings and improvements were substantially completed and became usable on March 1, 1947, and plaintiff contends that a depreciation is allowable only from this date to January 1, 1948, the date after which it was agreed depreciation should not be deducted.

Under the terms of the lease, Graham agreed to erect the buildings during the year 1945. However, it is admitted that it was unable to commence construction during that year because construction could not be accomplished without a permit from the War Production Board and the War Production Board did not issue a permit until April 29, 1946. Graham did obtain the permit on that date and proceeded with due diligence to erect the required structures.

The sixteenth paragraph of the lease provided that if the parties are unable to agree upon a renewal, the city shall acquire title to all of the improvements erected by the lessee under the terms of the lease and shall reimburse the lessee "at cost, less depreciation based upon a life of fifteen years." It could not be contended by the city this paragraph in the lease standing alone would require depreciation to be computed prior to the erection of the buildings. However, our attention has been called to the twenty-first paragraph of the lease wherein it is provided that if the lease is renewed for a further term of 12 years, ending December 31, 1959, that at the end of that term the city should become the owner of all the improvements erected by

the lessee without reimbursement. However, we cannot read into this provision an intention to amortize the improvements over a 15-year period beginning January 1, 1945, and ending December 31, 1959, without regard to the time when the buildings were erected. Ordinarily the life of a building does not begin until the building is substantially completed and ready for use. There is nothing in the language of the lease which would lead us to believe that the parties intended otherwise.

It will be noted that the twenty-first paragraph of the lease also provides that improvements erected subsequent to the year 1945 should likewise become the property of the city "under the same basis, i. e., the City shall reimburse the lessee at cost less depreciation based upon a life of fifteen years." As to such buildings it is apparent that the parties intended depreciation to commence at the date of erection.

The total cost of improvements erected by the lessee was $109,630.74. Of this sum $5,640.96 was attributed to the improvements and alterations made to the caretaker's house, which sum we have not allowed. The balance claimed by plaintiff, therefore, is $103,989.78, to which the city is entitled to a credit of depreciation of $5,777.21 computed for a period of 10 months, or from March 1, 1947, to January 1, 1948, on an expected life of 15 years. This would leave a balance due by defendant to plaintiff of $98,212.57.

Plaintiff also asks interest on this sum from March 15, 1948, the date on which the parties agreed to enter a friendly law suit and for the operation of the airport in the interim. In this agreement it is stipulated that there shall be no deduction for depreciation after January 1, 1948. However, the agreement is not a demand for payment, nor is a liquidated amount mentioned in the same. Both parties were apparently making an honest effort to compose their differences

and finally agreed on an amicable action in order to do so. Meanwhile the parties agreed that plaintiff should continue to operate the airport and that defendant should bear any operation losses. Under the circumstances, we feel no interest should be allowed.

Therefore, we enter the following

*Decree*

And now, September 19, 1949, after argument and upon due consideration, we find for plaintiff in the sum of $98,212.57, and the prothonotary is hereby directed to enter judgment in favor of plaintiff and against defendant in such amount.