CARLTON S. BRAGG and others *vs.* PARKER P. BURLEIGH.

*Reserved lands—right to cut timber and grass thereon.*

The provisions of the R. S. of 1857, c. 5, § 11, authorizing the land agents to sell the right to cut timber and grass growing upon all townships "until they are organized," is to be construed as terminating that right whenever any organization of the township, whether for election or plantation purposes, is perfected.

Nor can the land agent, by any form of language employed in his deed to the purchaser, extend the right to cut beyond the time of an organization of the township, for either purpose.

Where such deed professed to convey the right to cut till a township was organized for plantation purposes, it was nevertheless held that the right expired upon an organization of the township for election purposes.

ON REPORT.

REPLEVIN for certain logs cut in the winter of 1869 on the public lots reserved by the State in the east half of township No. 2, Range 5, W. E. L. S. The writ was dated June 11, 1869.

The plaintiffs claim title to the logs under a deed from the State, by B. W. Norris, then land agent, dated Dec. 26, 1862, to Davis R. Stockwell of the right to cut timber and grass upon the reserved land mentioned above, " until the said township or tract shall be incorporated, or organized for plantation purposes, and no longer."

The defendant, who was land agent at the time of the alleged trespass and has been ever since, contended that such right had ceased by reason of the organization of the township into a plantation by the name of " Silver Ridge," and that the plaintiffs were trespassers in cutting after that, and seized the logs in behalf of the State, under the authority and order of the governor and council, as trespass timber. There was no question but that the organization of Silver Ridge as a plantation for election purposes, was regular and sufficient for the end contemplated.

If the plaintiffs were authorized to cut after the township was organized for election purposes the defendant was to be defaulted; but if they could not justify under their deed the cutting after such organization, the case was to stand for trial that evidence might be introduced to show that certain of the logs replevied were not taken from the reserved lands aforesaid.

The case was elaborately argued by *Peters & Wilson* for the plaintiffs and by *A. W. Paine* for defendant, but as the R. S. of 1871, c. 5, § 12, confers upon the land agent the right to sell the timber and grass until the township is " incorporated into a town," the main point of their discussion has become immaterial, and is omitted.

DICKERSON, J. Replevin for certain logs cut on the public lot reserved by the State on the east half of township No. 2, Range 5, W. E. L. S., in the winter of 1869. The plaintiffs claim title to the logs under a deed from the land agent, to Davis R. Stockwell of the right to cut timber and grass on said public lot, dated Dec. 22, 1862. It is admitted that the plaintiffs' title is good unless the right to cut under that deed had ceased before the cutting, by reason of the organization of the township into a plantation by the name of " Silver Ridge."

Bragg *v.* Burleigh.

No question is made as to the validity of that organization for election purposes, the same having been legalized by the legislature. Special Laws of 1868, c. 570.

The plaintiffs' deed purports to give " the right to cut and carry away the timber and grass from the reserved lots," including the lot on which the logs in controversy were cut, " to continue until the said township or tract shall be incorporated, or organized into a plantation for plantation purposes." The authority of the land agent to give the deed is conferred by statute. He cannot exceed that authority by any recitals in his deed. The court, and not the land agent, are to give construction to the statute. The words, " for plantation purposes" contained in the deed, but not found in the statute, do not enlarge the plaintiffs' rights under their deed.

If the statute applies only to that class of plantations, the plaintiffs' rights would be complete without these words; if it does not their introduction into the deed does not restrict the rights of the parties to that kind of organization.

Nor does c. 135 of the public laws of 1870 amendatory of R. S. 1857, c. 5, § 11, affect the rights of the parties in this suit. It was passed after the litigation was commenced, does not purport to have a retrospective effect, and gives additional authority and new rights to the grantees in such cases.

The land agent's powers in such cases are given in R. S. of 1857, c. 5, § 11, which is as follows : " The land agent shall have the care of the reserved lands in all townships or tracts until they are incorporated or organized into plantations, and the fee becomes vested in the town, or is otherwise parted with. He may from time to time sell the timber and grass thereon, or the right to cut the same, for cash, except the grass growing on improvements made by an actual settler until so incorporated, or organized."

Did the contingency contemplated by the statute for terminating the plaintiffs' rights under their deed, arise when the township upon which the logs were cut was organized into the plantation of Silver Ridge ?

Whether such contingency then occurred depends upon the con-

Bragg *v.* Burleigh.

struction of the words, " organized into plantations," used in the statute. Does the word, " plantations," as there used, mean any plantation organized upon the township or tract on which the reserved lot is located? Or does it mean plantations organized in a particular mode, or for particular purposes? If the latter, what kind of plantations was intended, those organized for election or those organized for other purposes? The language of section 11 is general and may include both these classes of plantations. If, therefore, the statute is to be restricted to one particular kind of plantations, such intendment is to be ascertained by construction. According to well established rules of interpretation, the meaning of a statute is to be sought first of all in the words and language employed. When these are free from ambiguity, and clearly express the intent of the legislature, it is not allowable to resort to a subtle and forced construction in order to restrict or extend the meaning. The court will not undertake to interpret what is too plain to need interpretation.

The language of section eleven is clear and explicit. The care of the land agent over the reserved lands in all townships or tracts continues " until they are incorporated or organized into plantations, and the fee becomes vested in the town, or is otherwise parted with ; " and his authority to sell the timber and grass thereon, or the right to cut the same, ceases upon their being " so incorporated or organized." There is nothing in this section to indicate that one kind of plantations and not another was intended. In the absence of any other statute provisions upon this subject, there can be no question but this provision embraces plantations organized for election purposes, as well as plantations organized for other purposes.

But the meaning of a statute is to be ascertained, not from a single section, or provision of it, but from an examination and comparison of all its provisions upon the subject-matter under consideration. Sections 12, 13, 14, and 15 immediately following section 11, contain important provisions. The land agent is required to keep an account, with each township and tract, of his receipts and

disbursements, and pay the  balance  over  to  the  State  treasurer, who is to keep the same until such township or tract  is  authorized by law to receive it.   The money arising from  the  sale  of  timber and grass is set aside as a fund for  school  purposes ;  and  provision is made that  " the interest shall be added to the principal  of such fund, until the inhabitants of such  township  or  tract  are  incorporated into a town, or organized as a plantation for election or other purposes."

By these provisions plantations organized for  election  purposes are placed upon  the  same  footing  with  plantations  organized  for other purposes, in respect to their right to share the benefits of the fund arising from the sale of  grass and timber cut upon the  public lots, while  they  were  unorganized.   So far  from  discriminating against the former  class  of  plantations  and  in favor of  the  latter, the statute mentions " plantations organized for election purposes " first.   Sections 12, 13, 14, and 15 furnish a key to the  meaning of the words " organized into plantations," used in  section  11,  if  any such was needed, and exclude the construction that they mean only plantations organized for other than election purposes.   It is the fact of the organization of a township or tract  containing  reserved lots into a plantation, and not the purposes for which it is so organized, that terminates the land agent's authority to  sell  the  timber and grass on the public lots.   The moment such organization is effected according to law,  whatever be its purpose  or  mode  of  organization, that same moment the land agent's authority to sell such timber and grass, or the right to  cut  the  same,  ceases.   Nor  can he by his deed, bearing date previous to such organization  convey the right to operate upon the reserved lots after  such  organization has been effected.

In the two chapters of the R. S. of 1857,  next  preceding  that which contains the sections we  have  considered,  provision  is  made for  organizing  unincorporated  townships  and  tracts  of  land  into plantations for election  and  other  purposes ;  and  the  powers  and duties of these respective classes of plantations are defined.   Such organizations are  known  and  recognized,  not  only  in those  chap-

ters, but in other parts of the revision of 1857, by the general name of plantations, irrespective of the mode of their organization, or their purposes, powers, or duties. Neither organization has the exclusive right to appropriate to itself alone, the name of a plantation, or to assert a paramount claim to that appellation; on the contrary the title to plantationship is equally the right of both. If, therefore, in the next succeeding chapter of the Revised Statutes the words, "organized into plantations," are used without anything to define, limit, or qualify their meaning, they must be held to mean all plantations organized according to law. There is neither reason nor authority for holding that one class of organized plantations is intended and not another.

If we pass from the statutes to reason and public policy, we shall find that these lend their sanction to the view we have taken. Whatever provisions may have been previously made in respect to the reserved lands or the avails thereof, at the time of the enactment in question they were exclusively set apart for the cause of education and the support of schools. Plantations organized for election purposes, no less than plantations organized for plantation purposes, are vested with important powers, and required to perform grave duties. They are required to hold annual meetings for the choice of assessors, clerk, surveyors of lumber, fence-viewers, and constables. They have authority to raise money for the support of the poor, and have the same powers and duties as towns for the formation of school-districts, building school-houses, and supporting schools. R. S. of 1857, c. 4, § 71, c. 24, § 37, c. 11, § 59. They thus have the same necessity for, and the same power to appropriate, a share of this fund for the purposes for which it is specially designed and set apart by law, as plantations organized for more general purposes. Neither class of plantations can appropriate any part of this fund for any other purpose than the cause of education. Why then should the inhabitants of one organization be admitted as beneficiaries of this fund, to the exclusion of the inhabitants of the other organization? What object could the legislatures have had in making such discrimination?

Both classes of plantations are but incipient schools, preparatory to a town organization, which it is competent for each to enter upon without having passed through the ordeal of any other state of pupilage. Indeed participation in this fund would seem to be a substantial prerequisite for qualifying the inhabitants of a plantation for discharging the graver duties, and fulfilling the higher responsibilities of a town organization.

The intention of the legislature to include plantations organized for election purposes among the beneficiaries of the reservations upon the public lots, is so clear and unambiguous as almost to excite surprise that a contrary opinion should ever have been entertained. It is not improbable, however, that the mistake of the land agent in providing in his deed that the rights of the grantee should continue " until the said township or tract . . . should be organized for plantation purposes," originated in the misapprehension that the revised statutes of 1857, re-enacted the previously existing provisions of the statutes upon this subject; a misapprehension not likely to be corrected or complained of by the grantees. The prior statute limited the rights of the grantee to the organization of the township or tract " for plantation purposes," but the revised statutes established a different limit, to wit: the organization of the township or tract into a plantation ; thus, for the beneficiaries of these lots, abolishing the distinction between plantations organized for election purposes, and plantations organized for plantation purposes.

The legislation of the State upon this subject prior to the revision of 1857 changed several times, sometimes admitting plantations organized for election purposes to the benefit of this limitation, and sometimes excluding them therefrom, according, it would seem, as the influence or interests of the settlers, or of the lumbermen controlled the action of the legislature. The eminent jurist who had charge of the revision of the statutes of 1857, could not have been ignorant of the history of this legislation, or the causes that gave rise to such legislative vacillation. He was too well versed in lexicography, as well as judicial lore, not to understand

Bragg *v.* Burleigh.

the meaning of language, or the legal effect of changing the phraseology of a statute. Nor was he accustomed to change such phraseology without a purpose. He omitted the words " for plantation purposes " in the revised code of 1857, the manifest purpose and legal effect of which, in connection with the other language used in the revision, are to restore the inhabitants of plantations, organized for election purposes, to the rights they enjoyed in an earlier period of the legislation upon this subject. And yet it is gravely and ingeniously argued by the learned counsel for the plaintiffs that the statute means the same without as with these words. In other words, this court is called upon to find a distinction by construction where the legislature has abolished it in fact. We cannot adopt the learned counsel's construction of the statute without committing an act of judicial legislation, as repugnant to our inclination as it is incompatible with our duty. The legislature have said what they mean, and it is not for the court to say that they mean something different from what they have said.

This is not a case where either necessity or public policy invokes the court to interpose its powers of construction at the extreme limits of its authority. Far from it. The plaintiffs are presumed to know the law. They took their deed under the law, and must be content with what the law gives them. The legislature, and not this court, is the tribunal for hearing and deciding upon the equities of the plaintiffs' case, if any they have to present. This court, at least, will take care that they do not despoil the beneficiaries of this limitation of the land agent's authority, guaranteed to them by the plighted faith of the State.

*Case to stand for trial.*

KENT, WALTON, BARROWS, and DANFORTH, JJ., concurred.