Charles R. CUSHING, et al.

v.

STATE of Maine, et al.

Supreme Judicial Court of Maine.

Argued May 8, 1981.

Decided Aug. 24, 1981.

Severson & Hand, Lynwood E. Hand, Houlton, for Great Northern Nekoosa Corp.

Pierce, Atwood Scribner, Allen, Smith & Lancaster, Gerald M. Amero (orally), Portland, for all other appellees.

Lund, Wilk, Scott & Goodall, Martin L. Wilk, Sp. Asst. Atty. Gen. (orally), Augusta, for all defendants and State of Maine.

James E. Tierney, Atty. Gen., Rufus E. Brown, Kay R. H. Evans, Asst. Attys. Gen., Augusta, for defendants.

Before WERNICK, GODFREY, NICHOLS and ROBERTS, JJ.

ROBERTS, Justice.

In May 1973, the plaintiffs [1] brought an action for declaratory judgment in Superior Court, Kennebec County, pursuant to 14 M.S.R.A. §§ 5951–5963 seeking an adjudication of their rights and status as successors-in-interest to grantees of deeds from the State of Maine, between 1850 and 1875, conveying rights to cut timber and grass from the public reserved lots. Their suit was prompted by the so-called "Schepps Report," issued by the Department of the Attorney General in January 1973. That

---

1. Plaintiffs are Charles Cushing; Great Northern Nekoosa Corporation; International Paper Company; Prentiss & Carlisle Company; and Bradford Wellman, Richard Wheaton, and Peter B. Seamans, as trustees of a trust.

Named as defendants were the state Attorney General, the state Forest Commissioner, the Commissioner of the Department of Conservation, and the Director of the Bureau of Public Lands. As explained *infra*, the State of Maine has since been joined as a party.

report expressed conclusions concerning several aspects of the State's rights and powers with respect to the public reserved lots, including the opinion that the rights conveyed under timber and grass deeds excluded certain sizes and species of trees, and the "distinct possibility" that these rights had expired since timber in existence at the time of the conveyance had all been cut.

The ensuing proceedings, which culminated in October 1980 with an order of remand from this Court, are described in greater detail in *Cushing v. Cohen*, Me., 420 A.2d 919 (1980). As we explained in that opinion, the defendants first filed a motion to dismiss the complaint, asserting the state's sovereign immunity as one of the grounds for dismissal. The defendants later filed an answer and counterclaim seeking a declaratory judgment converse to that sought by the plaintiffs. This responsive pleading stated that it was filed subject to, and without waiving, the motion to dismiss. The State of Maine was designated as a counterclaimant even though it had not been named as a party to the original action. No action was taken to have the State added as a party pursuant to M.R. Civ.P. 21. Subsequent pleadings filed by the plaintiffs avoided naming the State of Maine as a party defendant. Subsequent pleadings and amended pleadings filed by the State agencies continued to leave ambiguous whether the Attorney General was undertaking to make the State a party defendant and whether he intended to abandon the protection of sovereign immunity.

In October 1974 the parties agreed to submit the case to a referee, pursuant to M.R.Civ.P. 53. By stipulation, the parties narrowed the submission to two issues: whether or not the public lot cutting rights related only to timber in existence at the time of the grant and whether or not those rights related to all sizes and species of trees. They reserved all other issues[2] and entered into an Agreed Statement of Facts comprising over 1,000 pages and more than 250 exhibits. Two days of evidentiary hearings were also held. The Referee issued his report in May 1979, deciding both issues in favor of the plaintiffs. The Superior Court overruled the defendants' objections, accepted the Referee's Report and entered judgment for the plaintiffs as recommended by the Referee. The defendants appealed.[3]

On that appeal, we vacated the judgment and remanded the case to Superior Court for proceedings to determine whether the State of Maine was a party defendant; to determine whether the State was an indispensable party and, if so, to take formal action to join the State as a party; and to determine whether the action was precluded by the State's sovereign immunity. *Cushing v. Cohen*, Me., 420 A.2d 919, 927–28 (1980).

On remand, pursuant to a stipulation by the parties, the Superior Court ordered the State of Maine to be joined as an indispensable party to the action.[4] In order to deal with the possible bar of sovereign immunity, the plaintiffs moved, pursuant to M.R. Civ.P. 41(a)(2), for voluntary dismissal of their complaint. The Superior Court granted the motion and further ordered "That the counterclaims of Defendants (including the State of Maine) shall remain pending for independent adjudication." The Superior Court then determined that sovereign immunity was not applicable to the counterclaims because the State had "affirmatively and voluntarily sought an independent adjudication," and again entered judgment in favor of the plaintiffs in accordance with the original report of the Referee. On December 22, 1980, the defendants filed the instant appeal from that judgment.

---

**2.** See Part II *infra*.

**3.** The defendants' first attempted appeal, in September 1979, was remanded to the Superior Court, pursuant to M.R.Civ.P. 54(b), because judgment had not been entered on the counterclaims. On that remand, the Superior Court entered a judgment on the counterclaims to reflect the same adjudication made on the plaintiffs' complaint. The defendants then appealed again, in November 1979.

**4.** Since the State was previously named as a counterclaimant, we interpret the stipulation and order to result in joinder as a party defendant and counterclaimant.

The issue of the State's sovereign immunity is no longer before us. The Legislature, by a Resolve approved on February 18, 1981, and effective immediately, gave its consent to this suit[5] and thereby waived any bar that may have been presented by sovereign immunity. Due to this action by the Legislature, we need not determine the validity of the Superior Court's determination that sovereign immunity was inapplicable to the action, and we express no opinion thereon.

## I

Before we address the merits of the appeal, a brief history of the public reserved lots is in order.[6] Before Maine became a state, Massachusetts maintained a policy of reserving, from grants of its public domain lands, certain lots for named public uses, including the use of the ministry and the schools.[7] *See Opinion of the Justices*, Me., 308 A.2d 253, 270 (1973). When Maine became a state, the Articles of Separation, Item Seventh, required similar reservations to be made in all grants of unlocated land within Maine:

All grants of land, franchises, immunities, corporate or other rights, and all contracts for, or grants of land not yet located which have been or may be made by the said Commonwealth [of Massachusetts], before the separation of said District [of Maine] shall take place, and having or to have effect within the said District, shall continue in full force, after the said District shall become a separate State. ... and in all grants hereafter to be made, by either State, of unlocated land within the said District, the same reservations shall be made for the benefit of Schools, and of the Ministry, as have heretofore been usual, in grants made by this Commonwealth. ...

This requirement, as part of the Articles of Separation, was incorporated into the Maine Constitution.[8]

In 1824, the Maine Legislature responded to this constitutional requirement by providing:

That there shall be reserved in every township, suitable for settlement, one thousand acres of land, to average in quality and situation with the other land in such township, to be appropriated to such public uses, for the exclusive benefit of such town, as the Legislature may hereafter direct.

**5.** Resolves, ch. 1 (1981) provides:

*Consent of Legislature. Resolved*: That to the extent that consent of the Legislature is necessary for the Attorney General to seek a final adjudication of the issues presented by the State for determination in *Cushing v. Cohen*, Law Court Docket No. Ken. 81–31, such consent is hereby granted. The Attorney General, on behalf of the State of Maine, is authorized to proceed, in his discretion, with such suit, and all prior involvement of the State in the proceedings, both in the Superior Court, Kennebec County, Civil Action Docket No. 1740–73, and in the Law Court, Docket Nos. Ken. 79–31 and 81–31, is hereby confirmed and ratified.

**6.** For further historical and background information see *Opinion of the Justices*, Me., 308 A.2d 253 (1973); Schepps, *Maine's Public Lots: The Emergence of a Public Trust*, 26 Me. L. Rev. 217 (1974).

**7.** For example, Acts and Resolves of Massachusetts, 1786, ch. 40 (November 9, 1786), establishing a lottery for the sale of fifty townships in Lincoln County, provided:

that there be reserved out of each Township, four lots of three hundred and twenty acres each, for public uses, *to wit*, one for the use of a public Grammar School forever, one for the use of the Ministry, one for the first settled Minister, and one for the benefit of public Education in general, as the General Court shall hereafter direct.

**8.** The Articles of Separation, Item Ninth, provided:

These terms and conditions, as here set forth, when the said District shall become a separate and Independent State, shall, *ipso facto* be incorporated into, and become and be a part of any Constitution, provisional or other, under which the Government of the said proposed State, shall, at any time hereafter, be administered; subject however, to be modified, or annulled by the agreement of the Legislature of both the said States; but by no other power or body whatsoever.

The Articles were adopted as section 5 of article X of the Maine Constitution. P.L. 1821, Vol. I, at 45–50. *See Opinion of the Justices*, Me., 308 A.2d at 268–69.

P.L. 1824, ch. 280, § 8.[9] The Legislature also provided that as townships became incorporated, title to these public reserved lots would become vested in the inhabitants of the town. P.L. 1824, ch. 254.[10] Legal title to public reserved lots in unincorporated townships was held by the State, as a trustee. *See Opinion of the Justices*, Me., 308 A.2d 253, 269–70 (1973); *Dillingham v. Smith*, 30 Me. 370, 381 (1849).

◼ As the State made grants from its public domain, the grantees took their land subject to these reservations for public uses, but the public reserved lots were often not "located," i. e., not partitioned from the township or tract out of which they were reserved.[11] Statutory procedures allowed the proprietors of a township to designate the actual metes and bounds of the reserved lot, and location could be accomplished by agreement between the State Land Agent and the proprietors or by judicial proceedings.[12] In 1850, the Land Agent was "authorized and required" to procure the location of the reserved lots in all townships and tracts where they had not already been located by the proprietors. P.L. 1850, ch. 196, § 3. Nevertheless, more than one-third of the public reserved lots were never located.[13] In townships where the public reserved lots are unlocated, the State is a tenant in common with the owners of the rest of the township. *See Hammond v.*

*Morrell*, 33 Me. 300, 305 (1851); *see also Mace v. Ship Pond Land & Lumber Co.*, 112 Me. 420, 92 A. 486 (1914).

From 1830 to 1850 the State tried various methods of managing the public reserved lots in the unincorporated areas in an attempt to deal with the widespread problem of timber trespass, i. e., theft of timber. In 1831, the Legislature put the State Land Agent in charge of the public reserved lots and directed him to "preserve the same from pillage and trespass." P.L. 1831, ch. 510, § 9. In 1842, responsibility for the public reserved lots was shifted to the County Commissioners,[14] and in 1845 they were authorized "to grant permits for cutting timber" on the public reserved lots in unincorporated townships in their counties, "not to exceed a permit for one six ox team on any one lot in each year." P.L. 1845, ch. 149. In 1848, after criticism of the manner in which the County Commissioners had managed the funds received from the sale of timber permits,[15] the Legislature transferred custody of the public reserved lots to special state agents, gave them authority to grant similar limited cutting permits, and provided that all income would be held in the state treasury. P.L. 1848, ch. 82.

In 1850, the Legislature enacted the law which gave rise to the conveyances with which we are now concerned. The State

---

9. The current version of this provision is 30 M.R.S.A. § 4151. In 1973, as part of a major revision of the legislation governing the public lots, P.L. 1973, ch. 628, this statute was amended to provide that the public reserved lots are for "the exclusive benefit of the State of Maine" rather than for the town. Section 4151 also now provides that "Title to such reserved public lots shall be in and all future earnings attributable thereto shall belong to the State of Maine for management and preservation thereof as state assets."

10. This provision is now included in 13 M.R.S.A. § 3161, but applies only to towns incorporated and in existence on January 1, 1973.

11. The land reserved for public uses is commonly referred to as the "public lots" or the "reserved lots," whether or not the acreage has been physically located. The terms "public lands" and "public domain" refer to all state-owned land.

12. *See* P.L. 1821, ch. 41; Me.Rev.Stat., ch. 3, § 14 (1841); Me.Rev.Stat., ch. 5, §§ 8–9 (1850). The current versions of the provisions for location of public reserved lots are 30 M.R.S.A. §§ 4151 and 4153.

13. As of 1963, there were approximately 398,-000 acres of public reserved lots in unincorporated areas, of which approximately 156,000 acres were unlocated. Of the approximately 320,000 acres on which timber and grass had been sold, approximately 153,000 acres were unlocated. State of Maine Forestry Dept., *Report on Public Reserved Lots* at 37–38 (1963).

14. P.L. 1842, ch. 33, § 21. P.L. 1844, ch. 129, § 5, authorized the County Commissioners to sue for trespass on the public reserved lots.

15. *See Report of the Joint Standing Committee on State Lands and State Roads*, House Doc. No. 20, 27th Legislature (1847).

Land Agent was given care and custody of the public reserved lots "in all townships or tracts of land unincorporated or not organized for election purposes." [16] P.L. 1850, ch. 196, § 1. The act also provided:

The land agent is hereby authorized and directed to sell for cash, the right to cut and carry away the timber and grass from off the reserved lands referred to in the foregoing section which have been located, excepting however the grass growing upon any improvements made by any actual settler, the right to continue until the tract or township shall be incorporated or organized for plantation purposes; and whenever any tracts or townships of land may be hereafter granted, either by the state or by the commonwealth of Massachusetts, or by both jointly, or when any tract or township may have been sold, but in which the reserved lands have not been located in one of the modes provided by law, the land agent of this state is hereby directed to sell the right to cut and carry away the timber and grass from off the lands reserved, until such township or tract shall be incorporated or organized as aforesaid, to the person or persons who shall or may own such tract or township, at the same rate per acre as the tract or township shall or may have sold for, making however, such reasonable deduction for the soil as in the opinion of the agent should be made: *provided*, such purchaser of the tract or township may elect to purchase such right; but in case such party refuses to buy the right aforesaid, the land agent is authorized to sell the same to any other person.

*Id.* § 2. In addition the 1850 Act directed that income from the public reserved lots, including proceeds from the sale of cutting rights, be kept in separate accounts for each township, to be held by the state treasurer until the township incorporated. *Id.* §§ 5 and 6.[17]

From 1850 to 1857 the Land Agent reported the sale of cutting rights on more than 230,000 acres of public reserved lots, including most of the cutting rights now at issue. During that period the Land Agent consistently used a printed form containing the following language:

That I, _____ Land Agent of the State of Maine, by virtue of authority vested in me by an act of the Legislature of this State, entitled "An Act in relation to lands reserved for public uses," approved August 28th, 1850, and in consideration of _____ dollars to me paid by _____ of _____ in the County of _____ the receipt whereof I hereby acknowledge, have granted, bargained and sold, and do by these presents bargain and sell unto the said _____ his heirs, executors, administrators and assigns, the right to cut and carry away the timber and grass from the reserved lots in Township _____ excepting and reserving, however, the grass growing upon any improvements made by an actual settler, said right to cut and carry away said timber and grass to continue until the said township or tract shall be incorporated, or organized for Plantation purposes, and no longer.

The Revised Statutes of 1857 made minor changes in the language of the 1850 Act.[18]

---

**16.** In 1852 the Act was amended to give the Land Agent care and custody of public reserved lots in townships organized for election purposes. P.L. 1852, ch. 284. At that time, an unincorporated township could be organized into a plantation "for the purpose of elections" upon written application to the county commissioners by three or more inhabitants who were eligible voters. P.L. 1840, ch. 89, codified at Me.Rev.Stat., ch. 4, §§ 70–78 (1857). Organization for election purposes was discontinued by P.L. 1870, ch. 121, § 17. Plantation organization is currently governed by 30 M.R.S.A. §§ 5602–5622.

**17.** In 1973 the Legislature terminated the provision for separate accounts and provided for the income from public reserved lots in unincorporated areas to be held in a general management fund. P.L. 1973, ch. 628, § 15; 30 M.R.S.A. § 4163.

**18.** The 1857 Revised Statutes, ch. 5, § 11 provided:

The land agent shall have the care of the reserved lands in all townships or tracts, until they are incorporated, or organized into plantations, and the fee becomes vested in the town, or is otherwise parted with. He

The legislation was also modified in 1870, 1874, and 1878.[19] Despite changes in the statutes, the Land Agent continued to use essentially the same language [20] in all instruments conveying public lot cutting rights until after 1875.[21]

The plaintiffs are successors in interest to the grantees under these conveyances made during the period form 1850 to 1875.[22] They have conceded that, for all practical purposes, all growth in existence on the date of conveyance is no longer in existence and all trees now on the land represent second or subsequent growth. Plaintiffs claim that they have the right to continue to make successive harvests of all forest growth of every description on the public reserved lots, whether or not it was in existence on the date of the original conveyance from the Land Agent. The defendants

> may from time to time, sell the timber and grass thereon, or the right to cut the same, for cash, except the grass growing on improvements made by an actual settler, until so incorporated, or organized, for such sum, as he thinks just and reasonable. When so sold, he shall give the purchaser a permit under his hand and seal, setting forth the terms of the contract, which shall be recorded in the office. The proprietors of the township or tract shall have the option to become purchasers thereof at the rate per acre for which the township or tract was sold.

In *Bragg v. Burleigh*, 61 Me. 444 (1871), we held that cutting rights conveyed by the Land Agent's timber and grass deed, while this statute was in effect, terminated upon organization of the Township for either "plantation purposes" or "election purposes."

**19.** P.L. 1870, ch. 135, § 2 deleted the language "or organized into plantations" and "or is otherwise parted with." It replaced the language "until so incorporated, or organized," with "until incorporated into a town." Resolves of 1874, ch. 319 provided:

> That the land agent . . . is authorized and directed to sell at public auction and convey all the remaining timber lands, and interest of the state in all timber lands held in fee by the state unconditionally and not heretofore otherwise appropriated, reserving lots for public uses. . . . Also for cash, the right to cut timber and grass on all lands reserved for public uses, not heretofore conveyed; said right to continue until the township in which said lands are respectively situated shall be organized into a plantation or incorporated into a town.

claim that the conveyances included only the right to cut timber then in existence. The defendants also claim that "timber" should be defined to include only trees of certain sizes and species.

## II

We emphasize, at the outset, the narrowness of the issues before us. The parties have stipulated that the only issues for determination in this proceeding are:

1. Whether or not the public lot cutting rights granted by the State of Maine during the period 1850–1875 related to and conveyed only the right to cut timber which was in existence at the time of the grant or whether such rights also included the right to cut timber thereafter coming into existence.

P.L. 1878, ch. 51 directed the Land Agent to sell at public or private sale all lands belonging to the State, "and also the right to cut timber and grass on lots reserved for public uses in any township or tract of land until the same is incorporated or organized into a plantation."

**20.** See note 26 *infra*.

**21.** In 1876 the Legislature directed the Land Agent to "bring to a termination all unsettled business connected with the land office, relating to the lands belonging to the state; to the end that the office may be discontinued at the earliest practicable moment." P.L. 1876, ch. 119. In 1891, the Land Agent became the Forest Commissioner. P.L. 1891, ch. 100 § 1. The position of Land Agent was abolished in 1923 and the Forest Commissioner became the caretaker of the public lots. P.L. 1923, ch. 196. In 1975, the Legislature established the Bureau of Public Lands within the Department of Conservation and the Bureau is now charged with the care, custody, control, and responsibility for management of the "public reserved lands." P.L. 1975, ch. 339; 12 M.R.S.A. § 552(1)(A) (Supp.1980). Management of the public reserved lands is also governed by 30 M.R.S.A. § 4162.

**22.** When this litigation began, approximately 320,000 acres were in dispute. Through settlement negotiations with the State, the plaintiffs have since relinquished their claims to approximately 145,000 acres. The plaintiffs currently claim rights on a total of 175,000 acres of public reserved lots. The plaintiffs have also indicated that the determination of the issues in this proceeding will affect the tax consequences of their settlement arrangements.

2. Whether or not the public lot cutting rights granted by the State of Maine during the period 1850–1875 related to and conveyed only the right to cut species and sizes of trees considered at the time of the grant to be suitable and merchantable for then prevailing commercial purposes, such as, without limitation, building houses or ships, or being squared off and cut into beams, rafters, planks and board, or whether on the other hand, such rights related to all or other sizes and all or other species of trees.[23]

The parties further stipulated that "all other issues" were reserved[24] and that:

It is expressly understood and agreed that such doctrines as estoppel, acquiescence, waiver, laches, or prescription, which plaintiffs might wish to raise in a subsequent case ... are not issues in this proceeding.

The Referee recommended entry of the following judgment:

1. The public lot cutting rights now owned by plaintiffs which were granted by the State of Maine during the period 1850–1875 related to and conveyed the right to cut timber which was in existence at the time of the grant as well as the right to cut timber thereafter coming into existence, and

2. That said cutting rights related to and conveyed the right to cut all sizes and species of trees.

To arrive at that recommendation, the Referee interpreted what he found to be the "clear and unambiguous" language of the 1850 statute, quoted above, and concluded that the grantees had received the right to make successive cuttings of all forest growth that was then existing or might come into existence before the organization or incorporation of the township. While not finding that the statutory language was ambiguous, the Referee reinforced this conclusion by finding that the legislative purpose in enacting the statute also supported an intent to sell the right to all present and future growth. The Referee also found that the subsequent performance of the purchasers and the State Land Agents lent further support to his interpretation. The Superior Court endorsed the reasoning of the Referee and entered judgment for the plaintiffs in accordance with his recommendation.

On this appeal, therefore, we are presented only with these narrow issues as they were framed by the parties and the Referee.[25] We are not deciding the present rights of the parties in light of their conduct and that of their predecessors over the past 130 years. We consider only whether the Superior Court erred in accepting the Referee's determination of what was conveyed to the original grantees during the period from 1850 to 1875.

■ In reviewing the Superior Court's judgment, we decline the defendants' invitation to engage in our own independent evaluation of the evidence presented to the

---

23. The parties have agreed upon "public lot cutting rights" as a neutral term for the interests being claimed by the plaintiffs.

24. Ordinarily we might not approve of such an artificial isolation of the issues. Since this is not an ordinary suit between private parties seeking a declaration of their rights under an ordinary deed or contract while attempting to foreclose consideration of issues raised by their subsequent performance, we understand why the complexity and uniqueness of the subject matter led the parties to proceed in this manner.

25. We are concerned that the phrasing of the issues in the parties' stipulation and in the Superior Court judgment may be unclear. The term "timber thereafter coming into existence" could be read to refer only to trees that came into being during the period after the conveyance but before any cutting took place. Depending on the definition of timber, it could also include trees that were too small to qualify as "timber" on the date of conveyance but grew to marketable size before any cutting. The Referee's report, however, makes it clear that the term includes second growth and successive generations of trees that have come into being after at least one complete cutting. As a practical matter, there is no need to explore the distinction between timber coming into existence after the conveyance and timber coming into existence after a cutting. The parties have agreed that under either characterization, all timber now on the land is "timber thereafter coming into existence."

Referee. The fact that the record consists of documentary evidence does not entitle the parties to a trial *de novo* on appellate review. *See Dunton v. Eastern Fine Paper Co.*, Me., 423 A.2d 512, 514–15 (1980). Moreover, the critical issue raised on this appeal is not the *factual* significance of documentary evidence, but the *legal* significance of documents granting rights in real estate. It is a proper part of our appellate function to question the legal accuracy of the Referee's interpretation of those documents. *See Gillespie v. Worcester*, Me., 322 A.2d 93 (1974); *Bank of Maine v. Giguere*, Me., 309 A.2d 114, 117 (1973).

### III

■ The Referee stated that the statute was the controlling document which must be interpreted because the conveyance could not exceed the authority thereby conferred. We agree that the Land Agent could not exceed the authority delegated to him by the Legislature. *See Bragg v. Burleigh*, 61 Me. 444, 446 (1871). For that reason, the language of the statute, as well as the language of the deed, must be considered. *See Abbott v. Chase*, 75 Me. 83, 90 (1883). Nevertheless, interpretation must begin—as in an ordinary transaction between private parties—with the language of the instrument of conveyance. As long as the Land Agent acted within the bounds of his statutory authority, the subject of the conveyances is not everything the Land Agent was *authorized* to convey or everything the Legislature *intended* to authorize him to convey, but only what he succeeded in conveying by the actual instrument of conveyance.

■ We have frequently repeated that the cardinal rule for interpretation of deeds is the intention of the parties as expressed in the instrument itself. "It is the intention effectually expressed, not merely surmised." *Penley v. Emmons*, 117 Me. 108, 110, 102 A. 972, 973 (1918). *See Sargent v. Coolidge*, Me., 399 A.2d 1333, 1344 (1979). If the language of the deed is ambiguous and the intention of the parties is in doubt, the court may then resort to rules of construction and may examine the deed in light of extrinsic circumstances surrounding its execution. *See, e. g., Gillespie v. Worcester*, Me., 322 A.2d 93, 95 (1974); *C Company v. City of Westbrook*, Me., 269 A.2d 307 (1970); *Bradford v. Cressey*, 45 Me. 9, 14–15 (1858).

■ In each conveyance of the public lot cutting rights now claimed by the plaintiffs, the interest conveyed by the Land Agent was:

> The right to cut and carry away the timber and grass from the reserved lots . . ., said right to cut and carry away said timber and grass to continue until the said town ship or tract shall be incorporated, [or organized for Plantation purposes] and no longer.[26]

We disagree with the Referee's conclusion that this language was sufficient to convey the right to cut trees not in existence at the time of the conveyance.

### A

The Referee appears to base this conclusion on the observation that there was not a sale of timber and grass *per se*, but rather a sale of the *right* to go on the land and cut and carry away timber—a right the parties have characterized as a profit a prendre in gross. We are unable to find any practical or legal distinction between a grant of ex-

---

**26.** Due to a statutory amendment in effect during 1873, the conveyances during that year omitted, by handwritten modification of the printed form, the bracketed language. For conveyances made during 1874 and 1875, the Land Agent used a new printed form in which the final phrase was "until the said township or tract shall be incorporated into a town or organized into a plantation and no longer."

The language of these conveyances is virtually identical to the language of the first authorizing statute, P.L. 1850, ch. 196, § 2, which authorizes and directs the Land Agent to sell: the right to cut and carry away the timber from off the reserved lands . . ., the right to continue until the tract or township shall be incorporated or organized for plantation purposes. . . .

Aside from the changes in the final phrase, the operative language of the printed form was not modified to reflect subsequent changes in the wording of the authorizing statutes.

clusive cutting rights and an outright sale of timber. Either characterization describes an interest in land. Neither is a mere easement or incorporeal right. *See Beckwith v. Rossi*, 157 Me. 532, 534, 175 A.2d 732, 734 (1961) (profit a prendre in gross is treated as an interest in the land itself); *Emerson v. Shores*, 95 Me. 237, 239, 49 A. 1051, 1052 (1901) (growing timber is part of the realty); *Hill v. Lord*, 48 Me. 83, 100 (1861) (right to take seaweed from the land of another is not an easement but a right to take a profit in the soil); 1 Thompson, *Real Property* §§ 136–37 (1980). Our previous decisions have spoken of the grant of a right to cut timber as equivalent to a grant of the timber itself. *See Brown v. Bishop*, 105 Me. 272, 277, 74 A. 724, 727 (1909); *Walker v. Lincoln*, 45 Me. 67, 70 (1858); *Small v. Small*, 35 Me. 400, 401 (1853).

No case has been called to our attention to support the theory that a grant of cutting rights—without more—conveys the right to continue cutting second, third, and successive growths after the existing growth is exhausted.[27] *See, e. g., M. & I. Timber Co. v. Hope Silver-Lead Mines, Inc.*, 91 Idaho 638, 428 P.2d 955 (1967) (grant of "the right and privilege to remove any and all timber" created profit a prendre and included only timber in existence at time of conveyance and not future growth after that had been harvested). At most, a grant of cutting rights, as distinguished from the sale of the timber itself, has been construed to include timber coming within the scope of the conveyance by growth after the date of conveyance but before any cutting takes place. *See McMillan v. Gurdon Lumber Co.*, 189 Ark. 628, 74 S.W.2d 631 (1934) (for the dissenting opinion, see 75 S.W.2d 229).[28] Since the only timber now in existence on the public reserved lots is not in that category of interim growth, but consists of successive generations of trees, the construction adopted in *McMillan* would not provide a basis for recognizing a distinction in this case.[29]

---

27. Plaintiffs rely primarily on two California cases. In *Crain v. Hoefling*, 56 Cal.App.2d 396, 132 P.2d 882 (1942), a landowner's conveyance of "only the agricultural and grazing rights" without conveying the fee and with explicit reservation of "any and all tunnel, mineral, timber and water rights," entitled the owner's successor to continue cutting successive growth of timber. But a conveyance of the "sole right and privilege to cut, fall and remove from" a second parcel "all the pine and spruce timber upon said land" conveyed only rights to timber then upon the land. In *Buffum v. Texaco, Inc.*, 241 Cal.App.2d 732, 50 Cal.Rptr. 852 (1966), the court held that a 1902 deed of "all the timber standing, lying and contained" on the land conveyed only timber that was merchantable in 1902.

It is not clear to us that the results in these cases rested on a distinction between "timber" and "the right to cut timber." If there is such a distinction in the law of California, we do not adopt it.

28. In *McMillan*, the court distinguished between the usual contract for sale of timber and a "license and privilege to cut all the timber which the purchaser desired" and held that the grantee had a right to "all the timber it desired on the land at any time during the life of the contract." The parties had only a ten-year contract, and their dispute involved trees that had grown to merchantable size or become merchantable by reason of changes in market conditions since the date of conveyance.

29. We reject the plaintiffs' contention that the Legislature recognized such a distinction by authorizing the Land Agent, with respect to the public reserved lots, to "sell the timber and grass thereon or the right to cut the same." Me.Rev.Stat., ch. 5, § 11 (1857). This language of the Revised Statutes did not represent a new legislative enactment but was a codification of P.L. 1850, ch. 196. Section 2 of that 1850 Act authorized sales of "the right to cut and carry away the timber and grass," but section 5 referred to "sales of the timber and grass." Subsequent legislation, referring to the Land Agent's authority under the 1850 Act, speaks of "sales of the timber and grass." Resolves of 1851, ch. 365; P.L. 1852, ch. 284. The legislative reports that preceded the 1850 Act also used the terms interchangeably. *E. g., Report of the Joint Standing Committee on State Lands and State Roads*, House Doc. No. 20, 27th Legislature (1847). An 1859 legislative report, referring to the sale of timber on other public lands, stated:

It makes no difference whether these contracts are in the form of permits for so many years, or sales of the timber with the right to enter and take it off, for so many years; as our courts have decided that the latter amounts only to permits for that time.

*Report of the Joint Standing Committee of State Lands and Roads*, House Doc. No. 12, 38th Legislature at 2 (1859). The language cited by the plaintiffs simply reflects this treatment of the two terms as equivalent.

## B

The Referee also relies on the indefinitely long duration of the cutting rights to support his conclusion that there was a right to cut whatever growth should come into existence before the terminating event. This reasoning is erroneous because it fails to recognize the twofold character of a timber deed. In *Penley v. Emmons*, 117 Me. 108, 111, 102 A. 972, 973 (1918), we emphasized the distinction between the *scope* of a timber grant and its *duration, i. e.*, between "what may be cut under the grant" and "when the right to cut may expire." Here it is clear that the right to cut continued until the terminating event—incorporation or organization of the township. If that event was far in the future or never took place, the grantees would have an indefinitely long time within which to exercise their right "to cut and carry away the timber." But that right applies only to whatever timber was originally included within the scope of the grant. It is still necessary to determine whether the language "the timber and grass from the reserved lots" includes or excludes growth not then in existence.

## C

The defendants argue that the proper rule for determining the scope of a timber grant is that the grant conveys only the timber in existence at the time of the sale unless a contrary intention is manifested by clear and definite language. Such a rule seems to follow from our decision in *Donworth v. Sawyer*, 94 Me. 242, 47 A. 521 (1900), in which we interpreted an 1850 deed conveying timber on public lands then owned by the Commonwealth of Massachusetts. We held that a grant of "all the pine and spruce timber standing on said Township" gave the grantees the right to cut trees standing on the date of the deed, along with the increase between the conveyance and the cutting, but did not entitle them to cut trees that had sprung up since the date of conveyance. The plaintiffs argue that *Donworth* does not apply to their deeds, which are not expressly limited to

"standing" timber. They argue that the omission of any terms such as "on," "now growing on," or "being upon" supports the Referee's conclusion that the grant was not limited to existing timber.

While such terms as "standing" or "now upon" are frequently set forth in timber deeds, their absence is not sufficient to make the deed a conveyance of a right to cut trees not then in existence. No case has come to our attention in which a court interpreted a timber grant to include such future growth without also finding words in the instrument of conveyance that clearly and unambiguously expressed an intent to include something more than the timber in existence at the time of the grant. *See Herron v. Rozelle*, 480 F.2d 282 (10th Cir. 1973) (Oklahoma) ("any future timber, that may in the future grow"); *Baca Land & Cattle Co. v. Savage*, 440 F.2d 867 (10th Cir. 1971) (New Mexico) ("all the timber, trees and wood and increment thereof"); *Colleton Mercantile & Mfg. Co. v. Gruber*, 7 F.2d 689 (E.D.S.C. 1925) ("all pine timber now standing, or which may be standing or otherwise, during the term hereinafter named"); *Baxter v. Mattox*, 106 Ga. 344, 32 S.E. 94 (1898) (timber "now upon, or that may hereafter grow upon" the land); *Baker v. Kenney*, 145 Iowa 638, 124 N.W. 901 (1910) ("all timber and growth of timber . . . forever"); *Clap v. Draper*, 4 Mass. 266 (1808) ("all the trees and timber standing and growing on said land *forever*"); *Franke v. Welch*, 254 Or. 149, 458 P.2d 441 (1969) ("all timber growing, grown or to be grown").

■ Ordinarily a grant of timber includes a right to have the existing trees and such rights in the soil as are necessary for nourishment and support of those trees. *Donworth v. Sawyer*, 94 Me. 242, 254, 47 A. 521, 524 (1900). A right to cut future growth, however, involves not only the awkwardness of conveying something that does not exist, but necessarily includes rights to use the soil for cultivation. For these reasons, courts in other jurisdictions have uniformly refused to presume that the parties to a timber deed intended a convey-

ance of timber not yet in existence. *See, e. g., Vandiver v. Byrd-Matthews Lumber Co.*, 146 Ga. 113, 90 S.E. 960 (1916) ("nothing in the deed to indicate that the parties intended to establish a nursery for cultivation of sprouts and saplings"); *Putnam v. Tuttle*, 76 Mass. (10 Gray) 48 (1857) (right to trees other than those growing on the date of conveyance "would be in effect a right in the soil itself"); *Hardison v. Lilley*, 238 N.C. 309, 78 S.E.2d 111 (1953) (court would not presume that the parties intended to create an easement in the land for the cultivation and growth of trees); *Bragg v. Newton*, 98 Vt. 102, 126 A. 494 (1924) (adopting reasoning of *Putnam v. Tuttle*).

■ We conclude that ordinarily a timber deed, whether in the form of a deed of the timber outright or in the form of a conveyance of the right to cut and remove timber, does not operate to convey the right to cut future growth; in the absence of words clearly manifesting an intent to include more, the deed conveys only the growth in existence at the time of the conveyance. Reading the Land Agent's deeds in light of this rule, we see no words manifesting such an intent.[30] Therefore, these deeds clearly were ineffective to convey an interest in any timber that was not in existence on the date of the conveyance.

### IV

■ In the absence of any express language, extrinsic surrounding circumstances would ordinarily not be sufficient to prove conveyance of something not expressly included in the deed. As the Referee observed, however, this is indeed a case of novel impression. While we endorse the general rule followed in other jurisdictions, no other case involves facts or circumstances even roughly analogous to those of this case. The historical background of this dispute, as well as the language used in the statute and in the instruments of conveyance, is unique. Therefore, it seems appropriate to follow the example set by the Referee. Although we do not find the language ambiguous, we will examine extrinsic factors that might manifest an intent to convey the rights now asserted by the plaintiffs. *See Bradford v. Cressey*, 45 Me. 9 (1858).

### A

■ The language of the authorizing legislation, to the extent that it differs from the language of the instruments of conveyance, does not suggest that the Legislature intended to authorize the sale of anything more than the existing growth. Whereas the Land Agent's printed form conveys the right to cut timber and grass "from" the reserved lots, the 1850 statute authorized sales of the right to cut timber and grass "from off" the reserved lots. While the language in the printed form did not change from 1850 to 1875, later statutes referred to the "timber and grass *thereon*"[31] and "timber and grass *on*"[32] the public reserved lots. We do not perceive that any of these statutory phrases manifests an intent to authorize the sale of timber not then in existence on the land.

The Referee attached significance to the statutory provision directing the Land Agent to sell the cutting rights on unlocated public reserved lots

> to the person or persons who shall or may own such tract or township, at the same rate per acre as the tract or township shall or may have sold for, making however, such reasonable deduction for the soil as in the opinion of the agent should

---

**30.** The plaintiffs have argued that the inclusion of the right to cut grass—an annual crop—prevents the conveyances from being limited to timber then in existence. Although both parties have assumed that the deeds included successive annual crops of grass, and not merely the grass then in existence, that question has not been raised or decided. The parties agreed that the grass was valuable primarily as food for the draft animals used in timbering operations. We do not consider the "and grass" portion of the deeds to be a clear manifestation of an intent to convey successive "crops" of timber.

**31.** 1857 Revised Statutes, ch. 5; P.L. 1870, ch. 135.

**32.** Resolves of 1874, ch. 319; P.L. 1878, ch. 51.

be made: *provided,* such purchaser of the tract or township may elect to purchase such right. . . .

P.L. 1850, ch. 196, § 2. *See Coe v. Bradley,* 49 Me. 388 (1862). The Referee concluded that this language was "a clear indication that both prices reflected one common denominator, the right to cut future growth, in one case forever, in the other case until the occurrence of an event which might occur in the very distant future or never."

The Referee's conclusion is not, however, the only rational interpretation of this provision. As the defendants argue, it is also reasonable to conclude that the "common denominator" was the value of the timber in existence at the time of purchase. The Referee's equation also does not take into account the fact that the public lot cutting rights, unlike the interest held by the owner of the township, were not subject to taxation during the period from 1850 to 1875.[33] Furthermore, we would hesitate to draw any conclusion about the subject of the conveyances from a statutory provision that applied only to unlocated lots.

B

The Referee concluded that even if ambiguity existed in the statute's language, the circumstances surrounding its enactment show that the Legislature's purpose would be served "only if *all* future cutting rights were conveyed." (Emphasis in original.) The parties agree that the Legislative purpose was a desire to deal with the problem of timber trespass on the public reserved lots. The defendants argue, however, that the trespass problem only involved timber then in existence and that once the right to cut that timber was sold, there would be nothing left to steal from the State.[34] It is not necessary to conclude, as did the Referee, that the Legislature also intended to permanently relinquish control over whatever might grow in the future on the public reserved lots.

The Referee's conclusion that the State must have intended to convey future growth rests in part on his statement that the Legislature "must be deemed to have been aware that in most instances Plantation organization would be delayed for many years and in many instances might never occur." The defendants argue that the evidence does not support a finding that the Legislature thought these townships would never be settled. The Legislature had provided that public lots only be reserved in townships "suitable for settlement," P.L. 1824, ch. 280, and had provided for separate accounts to be maintained for each township until it was incorporated. P.L. 1850, ch. 196, § 6. This circumstance appears, in any event, to relate not to the *scope* of the grant but to its *duration.* See Part III–B, *supra.* It seems reasonable to conclude that the *scope* of all the grants was intended to be the same, even though the *duration* would vary depending on when, if ever, the township became organized or incorporated. Although the purchaser of public lot cutting rights in a township that never became organized would have more *time* in which to remove the timber, it seems unlikely that he was also intended to receive more *timber* than the purchaser in a township that became organized soon after the conveyance.

---

**33.** Resolves of 1885, ch. 237, made the first provision for "valuation of the timber and grass on the reserved lands . . . for the purpose of taxation." A valuation made pursuant to that resolve was adopted by Resolves of 1887, ch. 29.

**34.** The attitude of the times is reflected in an 1842 Report to the Massachusetts Legislature from the Land Agent to Public Lands in Maine recommending that if certain public lands remained unsold, licenses to cut timber should be granted:

I would recommend that licenses to cut timber be granted on each township, sufficient to protect it from trespassers, even if such licenses be continued until the timber is wholly taken away, and then, as there will be no longer be any danger of depredation, from the fact of there being nothing left to pilfer— the soil may be retained, till its intrinsic worth is better known, and properly appreciated, then it can readily be sold for agricultural purposes.

Massachusetts Legislative Documents, Senate Doc. No. 6, at 7 (1843).

The Referee suggested that, unless the State completely relinquished ownership of all future growth, it would have had to maintain a "veritable army of foresters" to police the public reserved lots and ascertain that purchasers were cutting only the timber in existence at the time of conveyance. Even if the State would have needed such an "army"—a subject about which we need not speculate—the need would not have presented itself until many years later when subsequent growth reached marketable size. This factor cannot be significant for determining the Legislature's intent in 1850, in the absence of any evidence that the State contemplated this possible future enforcement problem. Moreover, the suggestion that the Legislature was aware of the need for future enforcement begs the question by assuming the Legislature actually contemplated future generations of marketable timber.

The Referee stated that the Legislature "was of course aware that over future years and even generations successive crops of valuable forest growth would grow upon the lots." While the Legislature may have had a common-sense awareness that there would be second growth, it cannot be presumed that the Legislature knew that later growth, after the removal of trees that were then hundreds of years old, would ever be valuable. The defendants argue that the evidence demonstrates, to the contrary, that reforestation and sustained yield forestry were not known in 1850 and there was no pulpwood industry to provide a market for young trees. In the absence of any indication that the Legislature entertained any thought of future generations of valuable timber, we find no clear manifestation that it intended to convey such timber away.

The Referee's findings about these factual circumstances, even to the extent supported by the evidence, do not uniformly and invariably point to the conclusion urged by the plaintiffs and adopted by the Referee. We consider these circumstances to be equally consistent with the narrower interpretation advocated by the defendants. The legislative objective of salvaging the value in the timber before it was destroyed by trespass appeared to be equally well accomplished by conveying only the timber then in existence.

## C

■ Finally, the Referee's report suggests that contemporaneous and subsequent performance of the parties is evidence of their intent and therefore can be used to construe the meaning of the conveyances. This approach can apply only to the conduct of the parties who actually participated in the original conveyance—not to conduct many years later by subsequent grantees and by successors to the holders of public offices. See *Lewiston and Auburn Railroad Co. v. Grand Trunk Railway Co.*, 97 Me. 261, 267, 54 A. 750, 752 (1903). As an indication of the contemporaneous understanding of the parties, the plaintiffs urge us to consider instances where the Land Agent conveyed public lot cutting rights in townships that had been substantially stripped of timber under prior cutting permits or through trespass or fire. The defendants argue that none of these lots was completely devoid of timber and that the low prices received by the Land Agent reflected the sale of a small amount of timber rather than a sale of potential future growth. The defendants also argue that the Land Agent's Reports demonstrate that the prices received for the sale of cutting rights were always based on the value of the timber then standing on the land. While the evidence in the record is equivocal, we see no clear indication that the Land Agent ever sold cutting rights on public reserved lots that were completely without timber and no indication that he ever expressly sold rights to potential future growth or determined a price on the basis of such potential.

As further indication of the parties' "practical construction" of the timber deeds, the Referee mentions the failure of the various state agencies ever to attempt to resell the cutting rights or to challenge the purchasers' cutting of successive growth. Since any action with respect to

subsequent generations of trees would have been taken by subsequent generations of landowners and public officials, such action or inaction cannot be considered determinative of the intent of the parties who actually participated in the original conveyances.

▮▮▮▮▮ Similarly, we attach no significance to the tax treatment of the public reserved lots. The public lot cutting rights were not subjected to any taxation until after 1887. See note 33, *supra*. Subsequent tax valuations and assessments which tend to treat the cutting rights as perpetual interests are not evidence of what the State originally intended to convey. The defendants also point out that the plaintiffs have been taxed on the basis of what they themselves claimed to own, not on any determination made by State officials. The record reveals nothing else in the conduct of the parties during the period in question that unequivocally manifests an intent to include future growth in these conveyances of public lot cutting rights.[35]

## V

If this were an ordinary transaction between private parties, we would not be willing to infer an intent to convey future growth, where such intent is not manifested by the language of the deed. We are all the more reluctant to allow that inference to be drawn here where the grantor was the sovereign acting in a special capacity as trustee of the public reserved lots.

▮▮▮▮ The ordinary rule that a deed is construed most strictly against the grantor and in favor of the grantee, *e. g., Rusha v. Little*, Me., 309 A.2d 867, 870 (1973), does not apply when the grant is from the sovereign and is not purely a commercial transaction. *Donworth v. Sawyer*, 94 Me. 242, 252, 47 A. 521, 523 (1900). The general rule is that public land grants are to be construed favorably to the government. *See United States v. Grand River Dam Authority*, 363 U.S. 229, 235, 80 S.Ct. 1134, 1138, 4 L.Ed.2d 1186, 1191 (1960); 3 Sands, *Suther-*

*land Statutory Construction* § 64.07 (4th ed. 1974). The sovereign will be presumed to have conveyed away no more than is necessary to achieve its purpose. *See, e. g., State Box Co. v. United States*, 321 F.2d 640, 641 (9th Cir. 1963).

▮▮▮▮ The State holds title to the public reserved lots as trustee and is constrained to hold and preserve these lots for the "public uses" contemplated by the Articles of Separation. *See Opinion of the Justices*, Me., 308 A.2d 253, 271 (1973). In light of this constitutional restriction, we should not assume that the State intended to convey such an interest in the land as would impair for the indefinite future its ability to provide for the management of the public reserved lots. While we do not express any opinion on the ultimate limits of the State's power to convey interests in the public reserved lots to private parties, we note that the Referee's report fails to recognize the possibility of such limits. The Referee's examination of the surrounding circumstances focused exclusively on the State's desire to reach a solution to its management problems, and did not consider other aspects of the State's responsibility as trustee of the public reserved lots. The importance of the State's duty as trustee, and the State's awareness of that duty, are inconsistent with the Referee's conclusion that the State's purpose required the statutes to be given a broad interpretation. The narrower interpretation urged by the defendants appears to be equally consistent with the State's purpose as ascertained from the language of the statutes and other extrinsic circumstances, while also avoiding exposure to the possibly grave consequences of exceeding the constitutional limits upon the State's power as trustee.

## VI

We conclude that the Superior Court erred in adopting the Referee's answer to the first question posed by the parties, be-

---

**35.** We express no opinion on the question of the effect, if any, the parties' subsequent conduct may have under such doctrines as estop-

pel, acquiescence, waiver, laches, or prescription, which are—by the parties' agreement— not at issue in this proceeding.

cause the Referee erred in his interpretation of the instruments of conveyance. The proper interpretation of the timber and grass deeds leads to the conclusion that the State conveyed only the right to cut trees in existence on the date of the conveyance. It is not necessary to address the second question, i. e., whether or not "timber" included all sizes and species of trees. The parties have conceded that, as a practical matter, all forest growth that was in existence on the date of the conveyances is no longer in existence. Therefore, regardless of whether or not the original conveyances included the right to cut all sizes and species of trees, everything that was included in those conveyances has now been exhausted.

The entry is:

Judgment of the Superior Court vacated.

Judgment to be entered declaring as follows: The public lot cutting rights granted by the State of Maine during the period 1850 to 1875 conveyed no right to cut timber not in existence on the date of the conveyance.

WERNICK and GODFREY, JJ., concurring.

NICHOLS, J., dissenting.

NICHOLS, Justice, dissenting.

I cannot join in the judgment of the majority announced this day.

I am persuaded by the logic of the Report of Referee that he reached the correct result. I am buttressed in that view by the circumstance that, after his Report was challenged in Superior Court, that court accepted his Report and adopted the Referee's conclusions. I am reinforced in that view by our Court's statement in State v. Mullen, 97 Me. 331, 338, 54 A. 841, 845

(1903), that a grantee under such a deed as those at issue here held the right to cut timber on the reserved lots "until incorporation of the township" with no suggestion by our Court that the grantee, or his successor in interest, was limited to the timber existing at the time of the grant.[1]

It is my individual view that we should affirm the judgment of the Superior Court.

At the outset all agree that the interests in the reserved lots conveyed by the several deeds under which these Plaintiffs derived their titles were profits à prendre.[2] The majority agrees there is no ambiguity in the language of these instruments. The controversy, then, is over whether the timber interests created thereby were limited to timber in existence at the time of the respective grants.

I submit that the interests were not so limited.

In the first place, notwithstanding that "standing timber," "timber standing upon such real estate" and "trees or grass standing or growing on such lands" were familiar terms to legislators and conveyancers in that long ago day,[3] I find it significant that neither the Legislature of 1850 in authorizing these grants nor the State Land Agent in making these grants chose to limit them to *standing* timber. Here the broad language of the grant was:

> the right to cut and carry away the timber and grass from the reserved lots . . . said right . . . to continue until the said Township or tract shall be incorporated or organized for Plantation purposes and no longer.

That right continued, I submit, not only until the timber then standing was harvested, but until the occurrence of the terminat-

---

1. At issue in that case decided some 50 years after the enactment of our 1850 statute was the right to cut timber on the reserved lots after a portion of the township had been incorporated as the town of Millinocket.

2. A profit à prendre is a right by one to take a part of the soil or produce of the land of another. *Beckwith v. Rossi*, 157 Me. 532, 534, 175 A.2d 732, 735 (1961). It may be a personal right, and therefore held in gross, or it may be a

right held as an appurtenance to other land. It is a license coupled with an easement. *Restatement, Property* § 399(b) (1944); 3 H. Tiffany, *Real Property*, § 427, *et seq.* (3d ed. 1939).

3. *See, e. g., Clap v. Draper*, 4 Mass. 266 (1808); *Erskine v. Plummer*, 7 Me. 447, 450 (1831); R.S., 1840, ch. 3, §§ 5, 8, 41; ch. 112, § 38; P.L. 1844, ch. 123, § 19.

ing event—the incorporation or organizing of the municipality.

Such an interpretation of the instruments is consistent with the rule of the Massachusetts case which was already on the books when the State Land Agent gave this series of deeds. *Clap v. Draper*, 4 Mass. 266, 267 (1808). In that case the conveyance was of the right to cut and carry away all trees and timber "standing and growing on said land forever." Speaking through Chief Justice Parsons, the Massachusetts court ruled that such language effectively comprehended not merely the trees and timber then standing but "all the trees and timber standing and growing on the close *forever.*"

In the second place, as we interpret the language of the deeds in controversy we must look to the four corners of each instrument. In a possible eagerness to reach a result we cannot consider only a part of the language and disregard the rest. Today's majority concludes that the grantees under these deeds and their successors in interest were entitled to harvest only a single crop. Do they limit these parties to a single crop of grass? When they say that the terminating event fixes, not the scope, but the duration of the interest conveyed by the deed, are they suggesting that the only grass conveyed was the crop then in existence, but that the grantee might have upward of a century to harvest that crop? It suffices to say that the same language is used in the instrument with reference to the timber and the grass. Neither in P.L. 1850, ch. 196, nor in the deeds given by the State Land Agent is any distinction drawn between the two crops. We should interpret this provision of a terminating event in a manner that is as rational for one crop as it is for the other.

In the third place, I am concerned over the difficulties ahead as a result of the majority's conclusion that of all the timber and grass now standing on the reserved lots the Plaintiffs own only the timber and grass which was in existence at the time

the deeds were given to their predecessors in interest. A few trees may obviously be that old. Vastly more trees may obviously be young growth. In between stand trees the age of which is not so apparent and which may well be the subject of controversy. These are difficulties which would be avoided under the judgment of the Superior Court.

In the fourth place, I am troubled by what almost appears to be an attempt to rewrite the history of that turbulent era in the Maine woods. Timber and meadow grass on thousands of acres were being lost to forest fires, not all of natural origin. Pillage of these reserved lots by trespassers was commonplace. The State Land Agent was selling in a competitive market because, early in this period at least, Massachusetts was still disposing of the lands in Maine which belonged to that commonwealth, and sales were being made from other large tracts, such as the Bingham purchases.[4] The State was, as the Referee noted, eager to get title as far as practicable into private parties who might be able to deal more effectively with the continuing problem of trespassers. Nevertheless, the majority's opinion implies that experienced businessmen of that period were ready to pay good money for a single crop of timber and a single crop of grass, not with a view to harvesting each crop at the optimum season, but sometime over a period of several decades.

Finally, I am disturbed by the majority's declaring that a conveyance of cutting rights without more conveys no rights beyond the crop then in existence, and then citing one Idaho case for the proposition which the majority would make the rule of this case. *M. & I. Timber Co. v. Hope Silver-Lead Mines, Inc.*, 91 Idaho 638, 640, 428 P.2d 955, 957 (1967). The Plaintiff in that case, however, claimed under a deed to "all that standing timber." In the deeds being interpreted in the case at bar there was no limitation to timber *standing* or to

---

4. *See* R. Wood, *A History of Lumbering in Maine, 1820–1861*, ch. III "The Timberlands" (1971); D. Smith, *A History of Lumbering in* Maine, 1861–1960, ch. 7 "Lumbering and Land Sales—1860–1890" (1972).

grass *growing* at the times of the several grants.

To me the broad language of the grant, set forth above, is clear and unambiguous. I would give it its plain meaning.